UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; ESURANCE INSURANCE COMPANY; and ESURANCE PROPERTY AND CASUALTY INSURANCE COMPANY, | C.A. No. _____ |
| Plaintiffs | **Demand for Jury Trial** |
| v. | |
| STAR PAIN MANAGEMENT & REHAB LLC; COMPREHENSIVE CARE PAIN MANAGEMENT, P.C.; CENTRAL HEALTH INSTITUTE CENTER OF MICHIGAN LLC; CROWN PROCEDURE CENTER LLC; GALAXIE DIAGNOSTICS LLC; MIDWEST MEDICAL LAB LLC; ALLAN SCHWARTZ MEDICAL CENTER PC; FOUR STAR CENTER LLC; NABIL BEYDOUN; FOUAD BAYDOUN; MUNA AFAN a/k/a MUNA BUTRUS; RIAD KHOURY, M.D.; VINOD SHARMA, M.D.; and ALLAN SCHWARTZ, D.O., | |
| Defendants. | |

## **COMPLAINT**

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance

Company, Allstate Property and Casualty Insurance Company, Esurance Insurance

Company, and Esurance Property and Casualty Insurance Company (hereinafter, "Allstate" and/or "plaintiffs"), by their attorneys, SMITH & BRINK, hereby allege as follows.

## I.   <u>INTRODUCTION</u>

1.     This case is about medical clinics, a urine drug testing company, a magnetic resonance imaging ("MRI") facility, ambulatory surgery centers, and the owners, managers, agents, and representatives of the same who abused the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through the U.S. Mail seeking payment under the No-Fault Act for treatment and services that were not actually rendered, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.     Defendants Star Pain Management & Rehab LLC ("Star Pain"); Comprehensive Care Pain Management, P.C. ("Comprehensive Pain"); Central Health Institute Center of Michigan LLC ("CHICM"); Crown Procedure Center LLC ("Crown Procedure"); Galaxie Diagnostics LLC ("Galaxie"); Midwest Medical Lab LLC ("Midwest"); Allan Schwartz Medical Center PC ("Allan Schwartz Medical Center"); and Four Star Center LLC ("Four Star Center") (collectively, the "Defendant Entities"); Nabil Beydoun ("Beydoun"); Fouad Baydoun ("Baydoun"); Muna Afan a/k/a/ Muna Butrus ("Afan"); Riad Khoury,

M.D. ("Khoury"); Vinod Sharma, M.D. ("Sharma"); and Allan Schwartz, D.O. ("Schwartz") (collectively, with the Defendant Entities, the "defendants") each conspired to, and did in fact, defraud Allstate by perpetuating an insurance billing fraud scheme in violation of state and federal law.

3.      The purpose of the fraudulent scheme devised and implemented by the defendants was to generate claims to, and collect payments from, Allstate pursuant to Michigan's No-Fault Act for the purported treatment of patients who had allegedly been involved in motor vehicle accidents.

4.      The defendants engaged in a fraudulent scheme to consistently bill Allstate for treatment or services that were never actually provided to patients and manufactured documents to make it appear as though patients received services when, in fact, no such services were rendered.

5.      If provided at all, the treatment consisted of unreasonable and unnecessary prescriptions for medication and physical therapy, urine drug testing, and MRIs, as well as unnecessary disability certificates.

6.      The defendants also engaged in several fraudulent billing practices, including unbundling services so as to inflate the amount charged and upcoding office visits in order to charge Allstate for more services than were actually provided.

7.     The defendants also charged excessive amounts that far exceeded reasonable and customary billing for services, including for office evaluations, MRIs, urine drug testing, and procedures.

8.     Allstate's investigation of claims submitted to it by and on behalf of the defendants revealed billed for treatment that was not tailored to the clinical needs of each patient, but rather was billed solely to generate profit for the defendants.

9.     Each of the defendants named herein conspired with one another to accomplish and to further the objectives of their fraudulent scheme.

10.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

11.     Allstate reasonably relied to its detriment on the bills and medical documentation submitted to it by and on behalf of the defendants.

12.     The insurance fraud scheme perpetrated by the defendants was designed to, and in fact did, result in the payment of No-Fault benefits from Allstate to and on behalf of the defendants.

13.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

14.     Allstate's claim for compensatory damages includes: (1) payments made by Allstate to Star Pain, Comprehensive Pain, CHICM, Crown Procedure, Galaxie, Midwest, Allan Schwartz Medical Center, and Four Star Center in reliance upon the false representations that they were eligible to receive payment under the Michigan No-Fault Act, (2) treble damages, (3) statutory interest, (4) costs, including but not limited to the costs of claims handling and the cost of investigation to uncover the fraudulent scheme perpetrated by the defendants, and (5) attorney's fees.

15.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that the defendants have no right to receive payment for any previously-denied and pending bills submitted to Allstate whereas (1) the defendants billed Allstate for services that were not rendered; (2) the defendants billed Allstate for services that were not lawfully rendered; (3) the defendants billed Allstate for services and treatment that were not reasonably necessary; and (4) the defendants engaged in a pervasive pattern and practice of submitting false medical documentation through the U.S. Mail demanding payment from Allstate.

16.     As a result of the defendants' fraudulent acts, Allstate has paid in excess of $366,682 to them related to the patients at issue in this Complaint.

## II.   THE PARTIES

### A.   PLAINTIFFS

17.    Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Illinois.

18.    Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company each have their respective principal places of business in Northbrook, Illinois.

19.    Esurance Insurance Company and Esurance Property and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Wisconsin.

20.    Esurance Insurance Company and Esurance Property and Casualty Insurance Company each have their respective principal places of business in San Francisco, California.

21.    At all times relevant to the allegations in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.   DEFENDANTS

#### 1.   Star Pain Management & Rehab LLC

22.    Star Pain Management & Rehab LLC is a limited liability company organized under the laws of the State of Michigan.

23.     At all relevant times, Star Pain was owned and controlled by Beydoun, Baydoun, and Afan.

24.     Star Pain's principal place of business is located in Madison Heights, Michigan.

25.     Star Pain billed Allstate for services that were not rendered and treatment that was unlawful and medically unnecessary (to the extent treatment was rendered at all) in relation to several patients at issue herein, including the patients set out in Exhibit 1.

### 2.     Comprehensive Care Pain Management, P.C.

26.     Comprehensive Care Pain Management, P.C. is a professional corporation organized under the laws of the State of Michigan.

27.     At all relevant times, Comprehensive Pain was owned and controlled by Khoury and Afan.

28.     Comprehensive Pain's principal place of business is located in Sterling Heights, Michigan.

29.     Comprehensive Pain billed Allstate for services that were unnecessary and unlawful in relation to several patients at issue herein, including the patients set out in Exhibit 2.

### 3.   Central Health Institute Center of Michigan LLC

30.   Central Health Institute Center of Michigan LLC is a limited liability company organized under the laws of the State of Michigan.

31.   At all relevant times, CHICM was owned and controlled by Beydoun.

32.   CHICM's principal place of business is located in Madison Heights, Michigan.

33.   CHICM billed Allstate for services that were unnecessary and unlawful in relation to several patients at issue herein, including the patients set out in Exhibit 3.

### 4.   Crown Procedure Center LLC

34.   Crown Procedure Center LLC is a limited liability company organized under the laws of the State of Michigan.

35.   At all relevant times, Crown Procedure was owned and controlled by Beydoun, Baydoun, and Afan.

36.   Crown Procedure's principal place of business is located in Madison Heights, Michigan.

37.   Crown Procedure billed Allstate for services that were unnecessary and unlawful in relation to several patients at issue herein, including the patients set out in Exhibit 4.

### 5.    Galaxie Diagnostics LLC

38.    Galaxie Diagnostics LLC is a limited liability company organized under the laws of the State of Michigan.

39.    At all relevant times, Galaxie was owned and controlled by Beydoun.

40.    Galaxie's principal place of business is located in Farmington, Michigan.

41.    Galaxie billed Allstate for diagnostic imaging that was unnecessary in relation to several patients at issue herein, including the patients set out in Exhibit 5.

### 6.    Midwest Medical Lab LLC

42.    Midwest Medical Lab LLC is a limited liability company organized under the laws of the State of Ohio.

43.    At all relevant times, Midwest was owned and controlled by Baydoun.

44.    Midwest's principal place of business is located in Toledo, Ohio.

45.    Midwest billed Allstate for services that were unlawful and unnecessary in relation to several patients at issue herein, including the patients set out in Exhibit 6.

### 7.    Allan Schwartz Medical Center PC

46.    Allan Schwartz Medical Center PC is a professional corporation incorporated under the laws of the State of Michigan.

47.     At all relevant times, Allan Schwartz Medical Center was owned and controlled by Afan and Schwartz.

48.     Allan Schwartz Medical Center's principal place of business is located in Sterling Heights, Michigan.

49.     Allan Schwartz Medical Center billed Allstate for services that were unnecessary and unlawful in relation to several patients at issue herein, including the patients set out in Exhibit 7.

### 8.     Four Star Center LLC

50.     Four Star Center LLC is a limited liability company organized under the laws of the State of Michigan.

51.     At all relevant times, Four Star Center was owned and controlled by Afan.

52.     Four Star Center's principal place of business is located in Sterling Heights, Michigan.

53.     Four Star Center billed Allstate for services that were unnecessary and unlawful in relation to several patients at issue herein, including the patients set out in Exhibit 8.

### 9.     Nabil Beydoun

54.     Nabil Beydoun is a resident and citizen of the State of Michigan.

55.    At all times relevant in this Complaint, Beydoun owned and controlled Star Pain, CHICM, Crown Procedure, and Galaxie.

56.    As the owner and manager of Star Pain, CHICM, Crown Procedure, and Galaxie, Beydoun was responsible for the unlawful, medically unnecessary, and unreasonably charged services billed related to the patients at issue in this Complaint, including the patients listed in Exhibits 1, 3, 4, and 5.

57.    As discussed herein, Beydoun also participated in the operation of Midwest.

### 10.    Fouad Baydoun

58.    Fouad Baydoun is a resident and citizen of the State of Michigan.

59.    At all times relevant in this Complaint, Baydoun owned and controlled Star Pain, Crown Procedure, and Midwest.

60.    As owner of Star Pain, Crown Procedure, and Midwest, Baydoun was responsible for the unlawful, medically unnecessary, and unreasonably charged services billed related to the patients at issue in this Complaint, including the patients listed in Exhibits 1, 4, and 6.

61.    As discussed herein, Baydoun also participated in the operation of Galaxie.

### 11.   <u>Muna Afan a/k/a Muna Butrus</u>

62.     Muna Afan a/k/a Muna Butrus is a resident and citizen of the State of Michigan.

63.     At all times relevant in this Complaint, Afan owned and controlled Star Pain, Comprehensive Pain, Crown Procedure, Allan Schwartz Medical Center, and Four Star Center.

64.     As owner of Star Pain, Comprehensive Pain, Crown Procedure, Allan Schwartz Medical Center, and Four Star Center, Afan was responsible for the unlawful and medically unnecessary treatment billed related to patients at issue in this Complaint, including the patients listed in Exhibits 1, 2, 4, 7, and 8.

65.     As discussed herein, Afan also participated in the operation of Galaxie and Midwest.

### 12.   <u>Riad Khoury, M.D.</u>

66.     Riad Khoury, M.D. is a resident and citizen of the State of Michigan.

67.     At all times relevant to this Complaint, Khoury owned and controlled Comprehensive Pain.

68.     At all relevant times, Khoury participated in the operation and control of Star Pain, Comprehensive Pain, Crown Procedure, and Four Star Center as the treating physician identified in the bills submitted to Allstate, including bills relating to patients set out in Exhibits 1, 2, 4, and 8.

69.     As the owner of Comprehensive Pain, Khoury was responsible for the unlawful, medically unnecessary, and unreasonably charged treatment at issue in this Complaint, including the patients set out in Exhibit 2.

### 13.     Vinod Sharma, M.D.

70.     Vinod Sharma, M.D. is a resident and citizen of the State of Michigan.

71.     At all times relevant to this Complaint, Sharma participated in the operation and control of Star Pain, Crown Procedure, Galaxie, and Midwest as the treating physician identified in the bills submitted to Allstate, including bills relating to patients set out in Exhibits 1, 4, 5, and 6.

### 14.     Allan Schwartz, D.O.

72.     Allan Schwartz, D.O. is a resident and citizen of the State of Michigan.

73.     At all times relevant to this Complaint, Schwartz owned and controlled Allan Schwartz Medical Center.

74.     At all relevant times, Schwartz participated in the operation and control of Comprehensive Pain, Allan Schwartz Medical Center, and Four Star Center as the treating physician identified in the bills submitted to Allstate, including bills relating to patients set out in Exhibits 2, 7, and 8.

75.     As the owner of Allan Schwartz Medical Center, Schwartz was responsible for the unlawful, medically unnecessary, and unreasonably charged treatment at issue in this Complaint, including the patients set out in Exhibit 7.

### III.    JURISDICTION AND VENUE

76.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiffs under 18 U.S.C. § 1961 *et seq*. because they arise under the laws of the United States.

77.    Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

78.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

79.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

### IV.    BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME TO DEFRAUD

80.    The defendants established various corporate entities for the purpose of defrauding Allstate.

81.    Laypersons Beydoun, Baydoun, and Afan worked together to create a fraudulent network of businesses as part of a scheme to maximize the amount that the defendants could bill insurance companies, including Allstate.

82.    In 2017, Beydoun, Baydoun, and Afan entered into an agreement and understanding to form Star Pain and further agreed that each member held a 1/3 ownership interest in Star Pain.

83.    Star Pain billed Allstate for treatment allegedly rendered by Khoury from October 2017 through July 2019.

84.    Khoury testified that Beydoun, Baydoun, and Afan each held themselves out as controlling Star Pain:

```
 6    Q.    Okay.  Did you see them there?
 7    A.    Always.
 8    Q.    All right.
 9    A.    Yes.
10    Q.    Did it appear that they were running the practice?
11    A.    It does.  Yeah.
```

85.    Khoury also testified that Star Pain only billed auto insurers under Michigan's No-Fault Act, describing the No-Fault Act as "a golden goose" because entities such as Star Pain "get more [payment]" from auto insurers than billing private insurers.

86.    In 2018, Beydoun, Baydoun, and Afan also agreed to form Crown Procedure with the understanding that each member held a 1/3 ownership interest.

87.     Crown Procedure is located at 28373 Dequindre Rd., Madison Heights, Michigan, in the same office as the main location of Star Pain and is simply one room within the Star Pain suite.

88.     Beydoun, Baydoun, and Afan formed Crown Procedure in order to bill insurers such as Allstate for unnecessary facility fees relating to routine injections that were previously billed by Star Pain without a facility fee charged.

89.     Khoury has testified that the creation of Crown Procedure allowed the defendants to submit bills seeking payment for facility fees in addition to the charges for the injections purportedly provided to patients:

```
 7      you, for example, at Providence Hospital, where I
 8      practice, there is a professional fee and there is a
 9      facility fee.  So they elect to have two corporations.
10      One is Crown and one is Star.  My professional fee
11      supposed to be coming from Star because I do the actual
12      procedure.  The facility fee is a facility you do the
13      procedure in it, which is part of Star Pain Management.
14      It is not a separate place.
15 Q.   So Crown is in Star?
16 A.   Exactly.
```

90.     Beydoun organized Galaxie on or about June 1, 2017.

91.     Patients who presented to Star Pain were referred to Galaxie for medically unnecessary MRI scans that were billed to Allstate.

92.    Khoury testified that as of sometime around July 2019, he was no longer treating patients at Star Pain.

93.    Khoury and Afan incorporated Comprehensive Pain on or about July 17, 2019, after working together at Star Pain and Crown Procedure.

94.    Khoury testified that approximately 90% of Star Pain's patients followed him to Comprehensive Pain, confirming that Afan "had something to do with" Star Pain's patients now presenting to Comprehensive Pain.

95.    In or around May 2020, Comprehensive Pain ceased submitting bills to Allstate.

96.    Afan and Schwartz incorporated Allan Schwartz Medical Center on June 15, 2020.

97.    Allan Schwartz Medical Center submitted bills and medical records for dates of service in June 2020 that identify 9001 15 Mile Road, Suite C, Sterling Heights, Michigan as its physical location, the exact same physical location as defendant Comprehensive Pain.

98.    Afan incorporated Allan Schwartz Medical Center to be a successor entity to Comprehensive Pain.

99.    For example, Allan Schwartz Medical Center submitted medical records to Allstate that contain the same telephone number, fax number, and patient identifier number that Comprehensive Pain used relating to the same patient:



100. Afan organized Four Star Center on February 18, 2020.

101. Four Star Center is located at 9001 15 Mile Road, Suite C, Sterling Heights, Michigan, the exact same physical location as Comprehensive Care and Allan Schwartz Medical Center.

102. Just as Afan formed Crown Procedure in order to bill insurers such as Allstate for unnecessary facility fees relating to routine injections, Afan formed Four Star Center to bill insurers for unnecessary facility fees relating to routine injections billed by Comprehensive Pain and Allan Schwartz Medical Center.

103. The defendants targeted auto insurers like Allstate and Khoury has admitted in sworn testimony that he applies different treatment for patients with auto insurance than Medicaid and Medicare:

Q.    Doctor, I'll be brief, but what do you mean by the
      golden goose?

A.    **Because I apply definitely different treatment for
      auto cases than the regular case of Medicaid and
      Medicare, which is a fact.**

104.   Using physical therapy as an example, Khoury explained that other insurance companies cut off physical therapy after three months, whereas he has seen people go to physical therapy for years with auto insurance coverage.

105.   The defendants' main goal was to bill for as much treatment as early and often as possible, regardless of whether such treatment was reasonable and necessary to each individual patient, in order to inflate and bolster bills submitted to auto insurers like Allstate.

106.   Several of the defendants and persons closely associated with the defendants and the scheme to defraud detailed herein have serious and extensive criminal and disciplinary histories.

107.   For example, Cheryl Simmons f/k/a Cheryl Ann Zardus ("Simmons") is the accountant for Crown Procedure and also provides billing services to Galaxie, Midwest, and CHICM.

108.   Simmons has testified that she is the sole owner of Complete Billing Services, LLC ("Complete Billing"), which provides billing services to several of the defendants.

19

109.   Simmons pleaded no contest to a felony charge of embezzlement over $20,000 on November 16, 2007 in Michigan state court.

110.   The Court sentenced Simmons to twenty-three (23) months to ten (10) years in prison on January 11, 2008 for embezzling more than $108,000 from her employer.

111.   As another example, the Michigan Department of Consumer & Industry Services ("DCIS") filed an Administrative Complaint against Sharma on September 14, 2001 after Sharma was arrested for providing prescription medication in exchange for sex as well as detailing Sharma's sexually inappropriate conduct towards female employees and patients.

112.   On February 12, 2003, the State of Michigan suspended Sharma's license for six months and a day on grounds of incompetency, moral unfitness, sexual misconduct, neglect, negligence, and prescribing controlled substances for non-therapeutic purposes.

113.   On December 17, 2008, the State of Michigan granted Sharma with a limited license for a minimum period of two years that included the limitation that a licensed health professional female chaperone be present in the exam room at all times when Sharma treated female patients.

114.   The State also placed Sharma on probation concurrent with the limitation period and with the condition that he enter into a monitoring agreement with the Michigan Health Professional Recovery Program ("HPRP").

115.   The State of Michigan filed another Administrative Complaint against Sharma on October 5, 2009 after Sharma failed to enter into a monitoring agreement with HPRP.

116.   Pursuant to an April 21, 2010 Consent Order, the DCIS Disciplinary Subcommittee fined Sharma and placed him on probation for 18 months.

117.   The State of Michigan filed yet another Administrative Complaint against Sharma on November 16, 2016, alleging that Sharma prescribed controlled substances without a license from January 31, 2016 through May 15, 2016.

## V.   KICKBACKS AND INDUCEMENTS TO OBTAIN PATIENTS

118.   Afan and Beydoun offered cash and in kind payments to patients in exchange for appearing at their facilities in order to ensure that patients that were referred into their network presented for the medically unnecessary treatment and testing used to generate claims to Allstate.

119.   As part owner of Star Pain, Galaxie, and CHICM, increasing the number of patients who present to these entities increased Beydoun's profits.

120.   CHICM was incorporated on March 21, 2019 by Beydoun and billed for treatment allegedly rendered at Heights Pain Management & Rehab PLC ("Heights Pain").

121.   According to testimony from Martin Dahhoo ("Dahhoo"), an individual who worked for Afan and Heights Pain and also allegedly presented to Star Pain for treatment, "Nabil" [Beydoun] marketed to other businesses to get their patients to present at Heights Pain.

122.   Dahhoo testified that Beydoun arranged cash transfers to those patients when they presented to Heights Pain.

123.   As part owner and office manager of Star Pain, Comprehensive Pain, and Allan Schwartz Medical Center, it was Afan's responsibility to secure patients.

124.   Khoury testified that he is not involved with finding patients at Comprehensive Pain and that he relies on Afan to get patients.

```
Q.   So you rely on the office manager to get patients?
A.   Yeah.  Plus my reputation is well-known.
```

125.   Dahhoo testified that Muna Afan paid people to appear at Comprehensive Pain.

126.   Patients who require monetary or other inducement in order to undergo treatment do not actually require medical treatment, and all charges submitted by the defendants related to such patients are fraudulent.

## VI.   BILLING FOR SERVICES NOT RENDERED

### A.   STAR PAIN BILLED FOR NERVE CONDUCTION STUDIES THAT WERE NOT PERFORMED

127.   Star Pain billed Allstate for nerve conduction studies ("NCS") that it did not perform.

128.   The following patients are representative exemplars of bills submitted to Allstate by Star Pain for alleged NCS that were not actually performed by Star Pain:

- Star Pain billed Allstate $2,600.00 for a NCS on November 18, 2017 relative to F.A. (Claim No. 0461346678).[1]  However, Star Pain did not perform the NCS it billed to Allstate.  Allstate is not required to pay Star Pain for NCS that it did not perform.

- Star Pain billed Allstate $2,600.00 for a NCS that it purportedly performed on December 16, 2017 relative to I.H. (Claim No. 0468062427).  However, Star Pain did not perform the NCS it billed to Allstate.  Allstate is not required to pay Star Pain for NCS that it did not perform.

- Star Pain billed Allstate $2,600.00 for a NCS that it purportedly performed on December 16, 2017 relative to A.A. (Claim No. 0475685087).  However, Star Pain did not perform the NCS it billed to Allstate.  Allstate is not required to pay Star Pain for NCS that it did not perform.

---

[1] To protect the confidentiality of its insureds, Allstate hereinafter refers to each by his or her initials and Allstate claim number.

129.   Allstate is not required to pay the defendants for services that they did not provide to patients, and is entitled to recoup any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

### B.   STAR PAIN BILLED FOR URINE DRUG TESTING THAT WAS NOT PERFORMED

130.   Urine drug testing was one of the primary methods utilized by the defendants to inflate bills mailed to Allstate.

131.   Star Pain billed Allstate for presumptive urine drug testing that was not actually rendered.

132.   Star Pain submitted charges for presumptive urine drug testing, using Current Procedural Terminology ("CPT") [2] Code 80305, without providing a single test result to substantiate the charges.

133.   The following patients are representative exemplars of bills submitted to Allstate by Star Pain for presumptive urine drug testing that was not actually performed:

- Patient S.H. (Claim No. 0494724552) allegedly provided a urine specimen for drug testing on four (4) separate visits from March 13, 2018 to June 18, 2018.  Star Pain billed CPT Code 80305 on each date of service but never produced a single test result, evidencing that the testing billed for was not in fact performed.

---

[2] CPT Codes are published by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

- Patient H.F. (Claim No. 0494724552) allegedly provided a urine specimen for drug testing on four (4) separate visits from March 14, 2018 to October 9, 2018.  Star Pain billed CPT Code 80305 on each date of service but never produced a single test result, evidencing that the testing billed for was not in fact performed.

- Patient M.K. (Claim No. 0514680578) allegedly provided a urine specimen for drug testing on August 27, 2018 and December 5, 2018.  Star Pain billed CPT Code 80305 on each date of service but never produced a single test result, evidencing that the testing billed for was not in fact performed.

134.   The defendants' pattern of mailing demands for payment for services that were not rendered is indicative of their goal to submit as many claims for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

135.   All of the claims submitted by the defendants to Allstate through the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

136.   Allstate is not required to pay the defendants for services that were never provided to patients, and is entitled to recoup any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

## C.   MIDWEST BILLED FOR DEFINITIVE URINE DRUG TESTING NOT PERFORMED

137.   For the vast majority of alleged urine drug tests at issue herein, the defendants submitted bills to Allstate for tests that were not actually performed or were otherwise medically unnecessary.

138.   CPT Codes for definitive/quantitative urine drug testing are usually specific to the drug being measured in a specimen.

139.   Definitive/quantitative urine drug testing is almost always more expensive than presumptive/qualitative testing and results in higher payment to the laboratory (Midwest) because presumptive/qualitative codes are ordinarily bundled and only one code is billed regardless of the number of drugs tested while definitive/quantitative codes are billed for each individual drug/analyte tested.

140.   According to the CPT Code Book published by the American Medical Association, definitive drug testing methods include, but are not limited to, gas chromatography with mass spectrometry (any type, single or tandem) and liquid chromatography mass spectrometry (any type, single or tandem) and exclude immunoassays (e.g., IA, EIA, ELISA, RIA, EMIT, FPIA) and enzymatic methods (e.g., alcohol dehydrogenase).

141.   However, Midwest failed to identify its urine drug testing methodology on its lab reports.

142.   Midwest's failure to identify the urine drug testing methodology it utilized for the hundreds of definitive urine drug testing charges submitted to Allstate renders each charge non-compensable.

143.   Allstate is not required to pay Midwest for the definitive/quantitative urine drug testing codes (CPT Codes 80321 through 80373) billed to Allstate.  *See* Exhibit 6.

### D.   UNSUPPORTED CHARGES FOR CPT CODE 72275

144.   Star Pain, Crown Procedure, and Star Pain Center fraudulently billed Allstate using CPT Code 72275, which is supported only when an epidurogram is performed via fluoroscopy guidance with the images documented and a formal radiologic report issued.

145.   Star Pain, Crown Procedure, and Four Star Center billed Allstate for CPT Code 72275 without basis.  For example:

- Patient T.F. (Claim No. 0497367243) allegedly presented to Crown Procedure on August 16, 2018 for a lumbar epidural block under fluoroscopy, purportedly performed by Khoury.  Star Pain and Crown Procedure submitted bills to Allstate for an injection and an epidurogram.  Star Pain billed Allstate for the professional component of the epidurogram using CPT Code 72275 while Crown Procedure billed Allstate for the technical component of the same.  The records mailed by Star Pain and Crown Procedure are both devoid of any evidence that an epidurogram was performed.  Therefore, Star Pain and Crown Procedure billed CPT Code 72275 for an epidurogram that was not performed.

- Patient R.H. (Claim No. 0502958416) allegedly presented to Crown Procedure on August 14, 2018 for a lumbar epidural block under fluoroscopy, purported performed by Khoury.  Star Pain and Crown Procedure submitted bills to Allstate for an injection and an epidurogram.  Star Pain billed Allstate for the professional component of an epidurogram using CPT Code 72275 while Crown Procedure billed Allstate for the technical component of the same.  The records mailed by Star Pain and Crown Procedure are both devoid of any

evidence that an epidurogram was performed.  Therefore, Star Pain and Crown Procedure billed CPT Code 72275 for an epidurogram that was not performed.

- Patient R.M. (Claim No. 0503772971) allegedly presented to Crown Procedure on August 6, 2018 for a cervical epidural block under fluoroscopy, purported performed by Khoury.  Star Pain and Crown Procedure submitted bills to Allstate for an injection and an epidurogram.  Star Pain billed Allstate for the professional component of the epidurogram using CPT Code 72275 while Crown Procedure billed Allstate for the technical component of the same.  The records mailed by Star Pain and Crown Procedure are both devoid of any evidence that an epidurogram was performed.  Therefore, Star Pain and Crown Procedure billed CPT Code 72275 for an epidurogram that was not performed.

- Patient J.E. (Claim No. 0568268304) allegedly presented to Four Star Center on May 18, 2020 for a lumbar epidural steroid injection under fluoroscopy, purportedly performed by Khoury.  Comprehensive Pain and Four Star Center submitted bills to Allstate for an injection and epidurogram.  Comprehensive Pain billed Allstate for the professional component of the epidurogram using CPT Code 72275 while Four Star Center billed Allstate for the technical component of the same.  The records mailed by Comprehensive Pain and Four Star Center are both devoid of any evidence that an epidurogram was performed at Four Star Center.  Therefore, Comprehensive Pain and Four Star Center billed CPT Code 72275 for an epidurogram that was not performed.

146.  Allstate is not required to pay Star Pain, Crown Procedure, and Four Star Center for their billing of CPT Code 72275 when no service was rendered.

## VII.  FORGED AND FALSIFIED RECORDS

147.  The defendants submitted falsified medical records in order to falsely justify charges submitted to Allstate for unnecessary treatment relating to the patients at issue herein.

A.   **S**TAR **P**AIN **F**ORGED **R**ECORDS **R**EGARDING **H**AMAD **H**OUWARI, **M.D.**

148.   Star Pain billed Allstate for treatment that was purportedly provided by Hamad Houwari, M.D. ("Houwari") for years.

149.   Houwari died on April 18, 2018.

150.   Notwithstanding his death, Star Pain billed Allstate seeking payment of $3,350.00 for treatment he purportedly performed on April 20, 2018, two (2) days after his death, relating to L.H. (TXA-0202810).

151.   The April 20, 2018 medical records submitted to Allstate also identify Houwari as the physician who evaluated L.H.:

| NOTE TYPE | SOAP Note |
| --- | --- |
| SEEN BY | Hamad Houwari MD |
| DATE | 04/20/2018 |

152.   Star Pain billed Allstate seeking payment for an initial evaluation, presumptive urine drug testing, a special report, a TENS Unit, and a back brace for which Houwari was identified as the treating physician:



153.   Star Pain submitted bills and medical records that falsely identified Houwari as the treating physician after Houwari died.

154.   Allstate is not required to pay the defendants for any charges relating to the forged and fabricated medical records mailed to Allstate, and is entitled to recoup any payments tendered to the defendants in reliance on their fraudulent submissions.

**B.   <u>STAR PAIN FORGED RIAD KHOURY'S MEDICAL RECORDS</u>**

155.   Khoury testified that there are two versions of his patient notes: (1) his handwritten notes that he writes during patient evaluations and (2) transcribed notes that are authored by Star Pain staff after allegedly interpreting Khoury's handwritten notes.

156.   Khoury testified that the transcribed notes are not accurate compared to his handwritten notes because Star Pain never provided the transcribed notes to Khoury to confirm their accuracy.

157.   For example, in June 2018, the State of Michigan began requiring physicians to discuss opioid usage with every patient prescribed opioids.

158.   Khoury testified that even though Star Pain's medical records relating to E.E. (Claim No. TXA-0195015) for dates of service after June 2018 contained language that Khoury "reviewed the '4 A's' of chronic opioid usage with the patient," Khoury testified that this phrase was not familiar to him and that he does not "use this phrase."

159.   However, almost every patient medical record authored by Khoury that Star Pain submitted to Allstate for dates of service after June 2018 contains this exact phrase.

160.   Thus, in order to defraud Allstate, Star Pain falsified patient records to make it appear as if Star Pain was treating patients in compliance with Michigan law, regardless of whether or not Khoury actually discussed opioid usage with patients.

161.   Khoury also testified that some of his signatures look "like a carbon copy, every time the same" and felt that "usually my signature would change [a] little bit if it's really [a] handwriting signature."

162.   For example, Khoury testified that Star Pain included his signature on requisition forms ordering expensive definitive urine drug testing from Midwest that he could not legitimize.

163.    As the owner of Midwest, Baydoun (also an owner of Star Pain) had a financial interest in Midwest billing Allstate for the expensive definitive urine drug testing.

164.    Star Pain forged Khoury's signature on requisition forms ordering definitive urine drug testing from Midwest in order to allow Midwest to submit fraudulent bills for unnecessary definitive urine drug testing to Allstate.

165.    Allstate is not required to pay the defendants for treatment that was billed based on forged and fabricated medical records, and is entitled to recoup any payments tendered to the defendants in reliance on their fraudulent submissions.

## VIII.  BILLING FOR UNLAWFUL TREATMENT

### A.    CROWN PROCEDURE AND FOUR STAR CENTER UNLAWFULLY BILLED ALLSTATE FOR TREATMENT WITHOUT A LICENSE

166.    A Freestanding Surgical Outpatient Facility ("FSOF") is a facility, "other than the office of a physician, dentist, podiatrist, or other private practice office, offering a surgical procedure and related care that in the opinion of the attending physician can be safely performed without requiring overnight inpatient hospital care."  Mich. Comp. Laws § 333.20104(7).

167.    A FSOF "shall not be used to describe or refer to a health facility or agency unless it is licensed by the department under this article."  Mich. Comp. Laws § 333.20811(2).

168.   In Michigan, the Michigan Department of Licensing and Regulatory Affairs, Bureau of Community and Health Systems issues licenses to FSOFs.

169.   Crown Procedure and Four Star Center have never obtained a license from the Michigan Department of Licensing and Regulatory Affairs, Bureau of Community and Health Systems to hold themselves out as a FSOF.

170.   However, Crown Procedure and Four Star Center have billed Allstate claiming to be a FSOF by billing for the facility fee related to various procedures.

171.   By way of example, Crown Procedure billed facility fees to Allstate for three separate injection procedures on July 3, 2018, July 16, 2018, and August 14, 2018 relating to patient R.H. (Claim No. 0502958416).

172.   As another example, Four Star Center billed facility fees to Allstate for an injection on May 18, 2020 relating to patient J.E. (Claim No. 0568268304).

173.   Crown Procedure and Four Star Center billed Allstate for unlicensed treatment, which is not compensable under the Michigan No-Fault Act.

### B.   DME ISSUED WITHOUT PROPER LICENSE

174.   Star Pain, Comprehensive Pain, and Allan Schwartz Medical Center issued durable medical equipment ("DME") to many patients without possessing the licensure required by the State of Michigan.

175.   A license from the Michigan Board of Pharmacy is required for all "drugs **and devices** manufactured, distributed, prescribed, dispensed, administered, or **issued in this state** . . . ."  Mich. Comp. Laws § 333.17722(a) (emphasis added).

176.   Star Pain, Comprehensive Pain, and Allan Schwartz Medical Center have not obtained the required license from the Michigan Board of Pharmacy.

177.   Star Pain, Comprehensive Pain, and Allan Schwartz Medical Center billed Allstate for unlawfully issuing DME to patients, as identified in Exhibits 1, 2, and 7.

178.   Unlawfully rendered treatment is not compensable under the Michigan No-Fault Act.

## C.   UNLAWFUL URINE DRUG TESTING

179.   Pursuant to the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), all laboratories must meet certain conditions to be certified to perform urine drug testing.  *See* 42 C.F.R. § 493.1.

180.   Midwest is a clinical laboratory that billed Allstate for performing drug testing on urine specimens and therefore must be certified by the State of Ohio in addition to the Centers for Medicare and Medicaid Services.

181.   Midwest received its certification to perform urine drug testing when it obtained its CLIA Certificate of Compliance (CLIA No. 36D2141921) from the Ohio Department of Health on December 28, 2017.

182. However, the Ohio Department of Health revoked Midwest's Certificate of Compliance on April 30, 2018 for its failure to have a qualified laboratory director.

183. Midwest did not obtain a re-certification from the Ohio Department of Health until January 15, 2019.

184. The Ohio Department of Health confirmed that "no testing should have been conducted [by Midwest] between 05/01/18 and 01/14/19." *See* Exhibit 9.

185. Yet, Midwest submitted bills to Allstate seeking payment in excess of $444,183 for urine drug testing that it purportedly performed from May 1, 2018 through January 14, 2019. *See* Exhibit 6.

186. Midwest was not certified to perform the urine drug testing from May 1, 2018 through January 14, 2019.

187. Thus, Midwest billed Allstate in excess of $444,183 for urine drug testing that was unlawfully performed, if performed at all.

D.   **UNLAWFUL FLUOROSCOPY SERVICES**

188. Crown Procedure and Four Star Center billed Allstate CPT Code 72275 for epidurograms that include fluoroscopy, which is a form of X-ray guidance.

189. Fluoroscopy is performed using a type of radiation machine and, therefore, Michigan law requires Crown Procedure and Four Star Center to register the machine before using it.

190.   "A person shall not … own, possess, or use a radioactive material or other source of ionizing radiation unless licensed, registered, or exempted by the department …."  Mich. Comp. Laws § 333.13505.

191.   Crown Procedure's radiation machine registration was issued on March 25, 2018 but expired April 1, 2019.

192.   Crown Procedure did not reregister its radiation machine.

193.   Nevertheless, Crown Procedure billed Allstate using CPT Code 72275 for epidurograms that were performed with fluoroscopy guidance starting on March 7, 2018 and continued to bill for these procedures after April 1, 2019.  *See* Exhibit 4.

194.   According to the State of Michigan, Four Star Center never registered a radiation machine, notwithstanding the fact that Four Star Center billed Allstate using CPT Code 72275 for epidurograms that were performed with fluoroscopy guidance starting on May 6, 2020.  *See* Exhibit 8.

195.   The bills submitted by Crown Procedure and Four Star Center for unlawful fluoroscopy services are not compensable pursuant to the Michigan No-Fault Act.

## IX.   FRAUDULENT UNNECESSARY AND EXCESSIVE TREATMENT

### A.   UNNECESSARY AND EXCESSIVE DISABILITY CERTIFICATES

196.   Star Pain, Comprehensive Pain, Khoury, Sharma, and Schwartz billed for disability certificates for unnecessary transportation services, attendant care, work disability, and replacement services, typically on a monthly basis, without regard to individual and actual medical needs.

197.   By doing so, the defendants sought to bolster the (false) appearance of a more serious injury and also to ensure patients returned for further visits with Star Pain and Comprehensive Pain.

198.   As the disability certificates and replacement services prescriptions were billed at one-month intervals, the patients were required to return regularly for new forms, which were falsely billed to Allstate as patient examinations.

199.   Considering the diversity of gender, age, comorbidities, and medical history with the defendants' patient population, it is highly improbable that the vast majority of patients at issue in this Complaint were actually disabled.

200.   In fact, Khoury testified that disability from a doctor is "nothing but bs," further proving that the disability certificates had no valid purpose.

201.   The following patients exemplify the defendants' indiscriminate use of disability certificates and prescriptions:

- Patient M.A. (Claim No. 0547671552) was eleven (11) years old at the time of her alleged motor vehicle accident.  Star Pain billed Allstate for

the disability certificate authored by Khoury that disabled M.A. from driving on July 1, 2019. Comprehensive Pain billed Allstate for the disability certificate authored by Khoury that disabled M.A. from driving on August 15, 2019. However, there is no medical necessity in disabling an eleven (11) year old from driving when M.A. was not even old enough to drive.

- Patient M.N. (Claim No. 0484244215) was thirteen (13) years old at the time of her alleged motor vehicle accident. Star Pain billed Allstate for a disability certificate authored by Khoury that disabled M.N. from driving on January 11, 2018. Clearly, it is not medically necessary to disable a thirteen (13) year old from driving when M.N. was not even old enough to drive.

- Patient V.S. (Claim No. 0552540866) allegedly presented to Comprehensive Pain on September 25, 2019 for an evaluation that was purportedly performed by Khoury. Comprehensive Pain billed Allstate for a disability certificate that was issued by Khoury that disabled V.S. from working and household chores for approximately four (4) weeks. During this time, however, V.S. was observed going to work and remaining for the full day, multiple times. She was also observed moving her head and neck in a fluid manner on multiple occasions. Thus, there was no medical necessity to disabling V.S. from work, especially when she was willing and able to continue working.

202. These disability certificates, which were sent to Allstate through the U.S. Mail, were fraudulently issued by Star Pain, Comprehensive Pain, and Khoury to create the appearance of serious injury and as an inducement for patients to continue treating with Star Pain and Comprehensive Pain who would not otherwise have treated but for the inducement of the disability certificates.

### B.    UNNECESSARY AND EXCESSIVE PRESCRIBED MEDICATIONS

203.   Star Pain, Khoury, and Sharma prescribed narcotic medication to Allstate insureds in total disregard for patient health, safety, and medical standards of practice.

204.   The prescription of narcotic medications served a multitude of purposes for the defendants.

205.   First, whether the patient became addicted, dependent, or was diverting the drugs on the street, the patient was were more likely to be compliant with Star Pain's treatment regimen and return to the clinic to obtain prescription re-fills.

206.   Second, by prescribing every patient controlled substances, the defendants could then claim the need to purportedly "monitor" the use of the drugs by scheduling follow-up appointments that were otherwise medically unnecessary.

207.   Third, the prescription of dangerous amounts of narcotic drugs was used by the defendants to attempt to justify their performance of outrageous amounts of unnecessary urine drug testing, as detailed below.

208.   Thus, the use of controlled substances by the defendants served as a means to the end of billing Allstate for as much medically unnecessary treatment as possible as opposed to legitimate patient care.

209.   The defendants' default frequent prescription of opioid pain medication was particularly egregious, as it contributed to a significant public health crisis in Michigan.

210.   On October 26, 2015, a bipartisan task force formed by then Michigan Governor Rick Snyder issued a report "addressing the growing prescription drug and opioid problem in Michigan."

211.   The task force reported:

> Prescription drug abuse has reached epidemic proportions. The increased availability of prescription drugs, coupled with general misperceptions regarding the safety of physician-prescribed medications, has led to exponential growth of drug users and drug abusers. In Michigan, the number of drug overdose deaths – a majority of which are from prescription drugs – has tripled since 1999.

212.   It has been estimated that the risk of addiction for patients receiving long-term prescriptions for opioid painkillers is as high as 56% of all such patients. Bridget A. Martell, *et al.*, *Systematic Review: Opioid Treatment for Chronic Back Pain: Prevalence, Efficacy, and Association with Addiction*, 146(2) Ann. Intern. Med. 116-127 (2007).

213.   As of June 2018, "before a controlled substance that is an opioid is prescribed to a patient, a licensed prescriber or another health professional shall provide information on...[t]he danger of opioid addiction … [and] shall obtain the signature of the patient or the patient's representative on a form prescribed by the

department of health and human services, indicating that the patient or the patient's representative has received the information…" Mich. Comp. Laws § 333.7303c.

214.   Neither Star Pain, Comprehensive Pain, nor Khoury has provided a single document signed by any patient that confirms they had this conversation, in violation of the law.

215.   The defendants' reckless prescriptions of drugs, especially narcotics, is exemplified by the following patients:

- Patient I.A. (Claim No. 0468062427) was purportedly prescribed the powerful opioid Norco (acetaminophen and hydrocodone) by Khoury throughout his treatment at Star Pain.  Yet, I.A. tested negative for all drugs during drug testing.  I.A. purportedly provided a specimen for urine drug analysis on four (4) separate visits.  For each test, the results came back negative for hydrocodone even though Khoury prescribed Norco to I.A.  Nevertheless, Khoury continued prescribing Norco to I.A. despite the inconsistent results.

- Patient J.G. (Claim No. 0486659261) was purportedly prescribed Norco (acetaminophen and hydrocodone) by Khoury on February 1, 2018 and continued throughout her treatment at Star Pain.  Yet, J.G. continually tested negative for Norco.  Nevertheless, Khoury continued prescribing Norco to J.G. despite the inconsistent results.

- Patient S.N. (Claim No. 0452243728) was allegedly prescribed Norco (acetaminophen and hydrocodone) by Sharma and then by Khoury.  At every appointment, S.N. purportedly provided a specimen for urine drug screening and testing, yet every sample was reported as negative for hydrocodone, despite the continued prescription for Norco.  Nevertheless, Sharma and Khoury continued prescribing Norco to S.N. despite the inconsistent results.

216.   Star Pain, Khoury, and Sharma used the excessively prescribed medications to support the charges submitted to Allstate through the U.S. Mail for the improper and medically unnecessary treatment billed relative to each exemplar patient referenced above and Allstate reasonably relied upon the mailed documents in adjusting the claims.

217.   Allstate is not required to pay the defendants for any medically unnecessary treatment or testing that resulted from the defendants' reckless and medically unnecessary prescriptions for narcotic medications.

### C.   UNNECESSARY AND EXCESSIVE URINE DRUG TESTING

218.   Star Pain billed Allstate for presumptive urine drug screens as a matter of course to inflate bills submitted to Allstate and was not used to affect each patient's treatment plan.

219.   Midwest billed Allstate for a litany of urine drug testing that was not actually performed; was medically unnecessary, unreasonable, and excessive; and was not performed in accordance with established standards of care for urine drug testing.

220.   Star Pain and Midwest billed Allstate for urine drug testing on urine specimens purportedly provided by patients who were not prescribed controlled substances at all, rendering such urine drug testing unnecessary.

### 1.    Improper Predetermined Presumptive Urine Drug Screens

221.   Star Pain, Afan, Khoury, and Sharma required patients to undergo presumptive urine drug screens on every visit.

222.   Khoury testified that "[e]very new patient, we [drug test] . . . ."

223.   Khoury further testified that each Star Pain patient undergoes presumptive urine drug screens even if he does not intend to prescribe any drugs to the patient.

224.   Khoury also testified that he did not perform presumptive tests as often at his personal practice and that the testing performed at Star Pain was performed according to Star Pain's protocol and he understood that "there is a financial benefit" from the testing.

225.   Pursuant to this (improper) policy, Star Pain billed Allstate for alleged presumptive urine screens associated with nearly every purported Star Pain patient examination, even when patients were not prescribed narcotics or other medications susceptible to abuse or misuse.

226.   Presumptive urine drug screening is used by providers to obtain immediate drug testing results indicating whether a patient's specimen contains the prescribed medication, an illicit substance, and/or a non-prescribed medication.

227.   Toxicology monitoring is only reasonable and medically necessary when it is performed randomly to assess a patient's compliance with treatment with controlled substances.

228.   Even when these presumptive screens showed no unexpected results or indications that patients were misusing their prescribed medications, Star Pain still routinely ordered further definitive confirmatory urine drug testing that was based on a predetermined panel preference that was not patient specific.

229.   All of the urine drug screens billed by Star Pain were performed (if at all) as a matter of course and without regard to medical necessity.

230.   The presumptive urine drug tests billed to Allstate had no effect on medical decision making by Star Pain, Khoury, and Sharma.

231.   For example, patient A.A. (Claim No. 0452963523) allegedly provided a urine specimen for drug testing on every office visit at Star Pain from April 17, 2018 through August 21, 2018.

232.   Star Pain billed Allstate for urine drug screens for each of A.A.'s visits.

233.   A.A. was prescribed Norco, a combination of hydrocodone and acetaminophen, which should have been present on the drug screens.

234.   The results returned were completely negative, there was no mention of the inconsistent results in A.A.'s medical record, and Star Pain continued to refill his Norco prescription.

235.   Allstate is not required to pay Star Pain for medically unnecessary urine drug screening, and is entitled to a return of monies it paid to Star Pain for these medically unnecessary urine drug screens.

## 2.   Medically Unnecessary Definitive Urine Drug Testing Orders

236.   Star Pain, Afan, Khoury, and Sharma routinely ordered, and Midwest routinely billed for, medically unnecessary definitive confirmatory urine drug testing for dozens of substances for the same patient on a regular schedule, often within just weeks of each other, which violates the standard of care for urine drug testing.

237.   It is almost never proper to order both a presumptive screening test and confirmatory laboratory testing at the same time.

238.   The standard of care for urine drug testing is that only unexpected screening results should be confirmed (absent extenuating circumstances that must be documented in the patient's medical records by the treating provider).

239.   This standard is documented by the Substance Abuse and Mental Health Services Administration ("SAMHSA"), a federal agency within the Department of Health and Human Services that sets guidelines for clinical drug testing federal programs, and states that "[i]n clinical situations, confirmation is not always necessary.  Clinical correlation is appropriate ….  In addition, a confirmatory test may not be needed; patients may admit to drug use or not taking scheduled medications when told of the drug test results, negating the necessity of a

confirmatory test.  However, if the patient disputes the <u>unexpected findings</u>, a confirmatory test should be done" (emphasis added).

240.  Thus, SAMHSA confirms that, at most, only unexpected initial screening results should be confirmed in the absence of a patient-specific decision otherwise from the treating provider.

241.  The level of definitive testing that Star Pain, Afan, Khoury, and Sharma ordered, and Midwest billed for, on the specimens of patients undergoing pain management treatment after involvement in predominantly low-level motor vehicle accidents significantly exceed the level of confirmation required by the Nuclear Regulatory Commission's ("NRC") policy on drug testing confirmation.

242.  Persons authorized to operate a nuclear power reactor under the scope of the NRC are required to submit to drug and alcohol testing as part of their continued duties.  10 C.F.R. § 26.31 (NRC's Fitness for Duty Program).

243.  The NRC mandates that "[s]pecimens that yield positive initial drug test results or are determined by initial validity testing to be of questionable validity must be subject to confirmatory testing by the laboratory, except for invalid specimens that cannot be tested."  10 C.F.R. § 26.31(d)(3)(i).

244.  The NRC defines "initial drug test" as "a test to differentiate 'negative' specimens from those that require confirmatory drug testing."  10 C.F.R. § 26.5.

245.   Thus, the NRC does not require that confirmatory testing be performed on negative screening (i.e., initial drug test) results for persons entrusted with operating nuclear reactors.

246.   Even when presumptive screens produce unexpected results, it is not proper to immediately refer a urine specimen for more extensive testing.

247.   Instead, the physician should discuss the unexpected results with the patient, and if the patient admits to drug misuse, further confirmatory testing is unnecessary.

248.   Star Pain, Khoury, and Sharma never addressed unexpected results with patients through discussion, as both the presumptive urine screens they allegedly performed and the definitive confirmatory drug testing ordered and allegedly performed by Midwest were only intended to generate bills to Allstate.

249.   Star Pain, Afan, Khoury, and Sharma ordered definitive urine drug tests on patients even when the patient was not prescribed any medications, or was prescribed only non-controlled substances, which has no medical basis.

250.   Khoury has confirmed that the presumptive testing billed by Star Pain "is accurate between 85 to 90 percent."

251.   Yet, Star Pain, Khoury, and Sharma ordered confirmatory urine drug testing on patients even when the presumptive screens provided expected results, which also has no medical basis.

252.   For example, patient J.Y. (Claim No. 0484244215) presented to Star Pain on February 8, 2018 for an initial evaluation purportedly performed by Khoury.

253.   J.Y. purportedly provided samples for urine drug analysis on four (4) separate visits, starting on February 8, 2018.

254.   Each presumptive urine drug screen billed to Allstate reported negative results for all tested substances, expected findings since J.Y. was not prescribed any of the drugs identified in the presumptive urine drug screen results.

255.   Despite the reported expected results, each of J.Y.'s urine specimens was referred to Midwest for medically unnecessary definitive confirmatory urine drug testing.

256.   The definitive confirmatory urine drug testing at issue herein was ordered only to generate charges to Allstate and was not used to influence the treatment plan of patients.

257.   In fact, Khoury testified that he was not given the Midwest test results unless he specifically asked for them.

258.   The failure to actually use test results to inform treatment plans reveals that the defendants ordered such testing as a matter of course to increase charges submitted to Allstate, and not out of medical necessity for the treatment of the patients at issue herein.

259.   The ordering of definitive confirmatory urine drug testing for nearly every Star Pain patient at nearly every appointment illustrates the lack of consideration of individual medical necessity for such testing.

260.   Midwest has confirmed that the urine drug testing ordered by Star Pain, Khoury, and Sharma was based on non-patient specific panel preferences, as follows:



261.   Khoury testified that he did not agree with every test that was run by Midwest:

```
Q.   So if are saying you want an opiate panel run, do you
     know why -- look how many things they are testing for.
     They're testing for about 50 different things?
A.   Totally unnecessary.
```

262. No physician or testing facility can properly make a blanket determination across all patients and all dates of service as to what constitutes medically necessary urine drug testing in all cases.

263. Instead, the individual provider must determine the reasonableness and necessity of urine drug testing on a patient-by-patient and visit-by-visit basis.

264. Abusive laboratory practices, including non-patient specific testing and the use of pre-printed forms that encourage excessive testing, have been condemned by authorities.

265. The federal government has expressly stated that it holds laboratories responsible for unnecessary testing and does not allow laboratories to blame excessive urine drug testing on the referring provider. 63 Fed. Reg. 45080 (Aug. 24, 1998).

266. With respect to custom profiles and testing panels, the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") has stated that "standing orders . . . too often . . . have led to abusive practices." Id. at 45081.

267.   The OIG has also stated that "[t]he laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill." Id. at 45079.

268.   The OIG further guides that "[l]aboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable and necessary." Id.

269.   Midwest's use of predetermined testing panels violates established standards of practice that demand that only medically necessary urine drug testing be performed, as decided on a patient-by-patient and visit-by-visit basis by a licensed healthcare professional.

270.   By testing for the exact same substances for every patient, regardless of age, medications prescribed, comorbidities, or other factors, Midwest knowingly submitted claims that could not have been medically necessary for each patient's clinical condition.

271.   It is the responsibility of Midwest to assure that it is performing only tests that are reasonable and medically necessary.

272.   Star Pain, Khoury, and Sharma never made any patient-specific determination as to what type of urine drug testing should be performed or which substances should be tested.

273.   Instead of taking steps to ensure that it was only submitting claims for necessary urine drug testing, Midwest intentionally worked to increase the number of medically unnecessary tests billed to payors like Allstate.

274.   Allstate reasonably relied on Midwest's bills to contain truthful and accurate representations regarding the urine drug testing allegedly performed and the necessity of the same.

275.   Tests that have no bearing on patient treatment are clinically useless and not medically necessary, and are therefore not compensable under the No-Fault Act.

276.   Allstate is not required to pay Midwest for urine drug testing that is not patient-specific and that is unnecessary, and Allstate is entitled to a return of monies it paid to Midwest for these medically unnecessary urine drug tests.

### D.   GALAXIE BILLED FOR MEDICALLY UNNECESSARY MRIs

277.   Galaxie had a responsibility to ensure that MRIs were properly ordered, but it intentionally chose not to do so in order to maximize the amount of charges it could submit to Allstate.

278.   The American College of Radiology ("ACR") is the principal professional organization of radiologists, radiation oncologists, and clinical medical physicists, and it defines the practice parameters and technical standards for conducting MRI scans.

279.    According to the ACR, an MRI should only be ordered after the physician has thoroughly evaluated and examined the patient and recorded the findings in the patient's medical record.

280.    For musculoskeletal joint MRIs, a basic orthopedic examination of the applicable part of the body, including documentation of range of motion and response to provocative maneuvers, should be performed and documented in the medical record.

281.    The ACR's practice parameters also state that a basic neurological examination should be done and recorded prior to an MRI of the brain or spinal region.

282.    Nevertheless, the MRIs at issue in this Complaint routinely lacked any documentation of why the MRI was recommended or medically necessary, much less sufficient information to allow for proper performance and interpretation of the MRIs prescribed by referring physicians.

283.    Pursuant to the ACR guidelines, it is the responsibility of the defendants to assure that all MRIs referred to their facilities are proper.

284.    MRIs at issue herein were also routinely ordered at the onset of the patient's treatment, thus evidencing that MRIs were resorted to as a matter of course regardless of each patient's unique symptoms and each patient's response to initial treatment.

285.   Such a practice is belied by medical literature stating "that unnecessary imaging may do more harm than good.  Multiple randomized controlled trials have shown that the early use of imaging for [lower back pain] is not associated with improved outcomes and may even be harmful to the patient."   Brendan J. McCullough, et al., Lumbar MR Imaging and Reporting Epidemiology: Do Epidemiologic Data in Reports Affect Clinical Management?, 262 Radiology 941, 945 (2012).

286.   Indeed, early resort to MRI has been denounced by The American College of Physicians for its "inefficiencies" and "potential harms."  Id.

287.   The defendants routinely billed for MRIs relating to patients who had only just initiated treatment.

288.   Sharma testified that he ordered MRIs regularly as part of his predetermined protocol.

289.   Khoury also testified that he regularly sent people for an MRI on the first visit.

290.   For example, patient A.M. (0509086757) testified that she presented to Star Pain on July 30, 2018 for an initial evaluation with Khoury.

291.   At the end of the initial office visit, A.M. was provided an MRI prescription for her cervical, lumbar, and thoracic spine and directed to defendant Galaxie.

292.   A.M. presented to Galaxie for her MRI because she was ordered to by Star Pain and was not given a choice:

```
 3   Q.   And how is it that you came to go to the particular
 4        facility?
 5   A.   They gave me the address and I went.
 6   Q.   Who gave you the address?
 7   A.   Dr. Khoury.
 8   Q.   Did he provide you with a list of different MRI centers
 9        to chose from?
10   A.   No, he did not.
```

293.   Galaxie billed Allstate for MRIs that were purportedly performed just ten (10) days after A.M.'s initial evaluation at Star Pain.

294.   It is not possible that patients who underwent MRIs just days or weeks after their alleged motor vehicle accidents attempted conservative treatment as required by the ACR before resorting to MRI imaging.

295.   The patients at issue herein who received MRIs at Galaxie within the first days and weeks after their alleged motor vehicle injuries had non-emergent medical conditions, not the type of fracture or neurological injury that would justify overriding the ACR's directives to attempt conservative treatment before imaging.

296.   MRIs should be limited to the symptomatic body part and it is uncommon to order MRIs on more than one region of the body.

297.   The defendants' fraudulent billing for medically unnecessary MRI scans is exemplified by the following representative patients:

- Patient A.O. (Claim No. 0503772971) was allegedly in a motor vehicle accident on May 29, 2018.  A.O. presented to Star Pain on June 1, 2018 for an initial evaluation that was billed by Khoury.  Two weeks later at the next office visit on June 14, 2018, Khoury issued an MRI prescription for A.O.'s lumbar and cervical spine without any basis.  As the alleged accident occurred just two weeks prior, obviously no conservative treatment was attempted prior to the MRI prescription by the defendants.

- Patient R.R. (Claim No. 0497404590) was allegedly in a motor vehicle accident on April 3, 2018.  R.R. presented to Star Pain one week later on April 10, 2018 for an initial evaluation billed by Khoury.  Khoury issued an MRI prescription for R.R.'s bilateral shoulders, cervical spine, lumbar spine, and bilateral knees, without any basis and without allowing any conservative treatment to occur prior to the referral for multiple MRIs.

- Patient N.D. (Claim No. 0484244215) was allegedly in a motor vehicle accident on March 27, 2018.  N.D. presented to Star Pain on April 3, 2018 for an initial patient evaluation that was billed by Khoury.  Khoury issued an MRI prescription for N.D.'s lumbar spine and right knee without any basis or necessity for the MRI referral, as clearly conservative treatment was not attempted prior to the MRI referral since the alleged accident had occurred only one week prior.

E.   **CROWN PROCEDURE AND FOUR STAR CENTER BILLED FOR UNNECESSARY FACILITY FEES**

298.   Crown Procedure and Four Star Center were both organized simply to submit bills for medically unnecessary facility fees relating to minor procedures that were performed, if at all, in an office setting and not a surgical setting.

299.    Crown Procedure was formed by Afan, Beydoun, and Baydoun for the sole purpose of generating additional charges to Allstate for the medically unnecessary injections and related procedures billed by Star Pain, Khoury, and Sharma.

300.    Crown Procedure is located in the same physical location as Star Pain and is used to submit charges for "facility fees" relating to injections that were previously performed in the offices of Star Pain without any facility fees.

301.    Four Star Center was formed by Afan for the sole purpose of generating additional charges to Allstate for the medically unnecessary injections and related procedures billed by Comprehensive Pain, Allan Schwartz Medical Center, Khoury, and Schwartz.

302.    Four Star Center is located in the same physical location as Comprehensive Pain and Allan Schwartz Medical Center and is used to submit charges for "facility fees" relating to minor injections that do not require a surgical setting to be performed.

303.    Sharma has testified that injections do not need to take place in a surgical suite:

```
Q.   So if there were injections given or a treatment given,
     they were given in the examination rooms?

A.   Yes.

Q.   There wasn't -- for example, there wasn't a surgical
     suite or anything like that?

A.   No, there is no surgical suite.
```

304.   Khoury testified that Star Pain had three (3) examination rooms, an office, and a procedure room.

305.   Khoury confirmed that the procedure room was called Crown Procedure and it is "just another room with a fluoroscopic arm in it."

306.   He also testified that Crown Procedure "is not a separate place":

```
15 Q.   So Crown is in Star?
16 A.   Exactly.
```

307.   Khoury also confirmed that the fluoroscopic arm used for his injections could be in a physician's office.

308.   All of the facility fee charges submitted by Crown Procedure and Four Star Center corresponded to minor injection procedures that were not medically required to be performed in a surgical site setting and are therefore non-compensable under Michigan's No-Fault Act.

309.   Allstate is not required to pay Crown Procedure and Four Star Center for the fraudulent, unnecessary, and unreasonable facility fee charges at issue in this

Complaint, and Allstate is entitled to a return of the monies it paid in reliance on the defendants' fraudulent submissions.

## X.     **FRAUDULENT BILLING PRACTICES**

310.   Providers like Star Pain, Comprehensive Pain, CHICM, Midwest, Allan Schwartz Medical Center, Khoury, Sharma, and Schwartz have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

311.   The defendants failed to meet this responsibility and instead submitted bills for unreasonable payments to Allstate for medically unnecessary and excessive services, as discussed *supra*, and used fraudulent billing practices, as discussed *infra*.

312.   All of the medical records, bills, and invoices submitted to Allstate by, and on behalf of, the defendants contained CPT Codes.

313.   The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms ("HICF") approved by the National Uniform Claim Committee (NUCC) and referenced in the NUCC Instruction Manual.

314.   The back of all HICF contain the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

315.   Despite the warning on the back of HICF, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through the U.S. Mail.

### A.   DUPLICATIVE BILLING

316.   Star Pain and Midwest each billed Allstate seeking payment for purportedly providing the same treatment to the same patient on the same date of service.

317.   Star Pain billed Allstate for presumptive urine drug screens using CPT Codes 80305 and 80306.  *See* Exhibit 1.

318.   Star Pain referred patients' urine specimens to Midwest for confirmatory urine drug testing as a matter of course, as discussed *supra*.

319.   Midwest also billed Allstate for presumptive urine drug screens using CPT Codes 80305 and 80306 relating to urine specimens referred by Star Pain.  *See* Exhibit 6.

320.   Midwest and Star Pain fraudulently double billed Allstate for presumptive urine drug screens using CPT Code 80305 relating to the same patient on the same date of service, as detailed in the chart below:

| Defendant | Claim No. | Patient Initials | Date of Service | CPT Code | Billed Amount |
|-----------|-----------|------------------|-----------------|----------|---------------|
| Midwest | 0457472520 | B.F. | 1/16/2018 | 80305 | $85.93 |
| Star Pain | 0457472520 | B.F. | 1/16/2018 | 80305 | $400.00 |
| Midwest | 0461082844 | E.A. | 1/17/2018 | 80305 | $85.93 |
| Star Pain | 0461082844 | E.A. | 1/17/2018 | 80305 | $400.00 |

| Defendant | Claim No. | Patient Initials | Date of Service | CPT Code | Billed Amount |
|-----------|-----------|------------------|-----------------|----------|---------------|
| Midwest | 0468062427 | D.A. | 2/27/2018 | 80305 | $85.93 |
| Star Pain | 0468062427 | D.A. | 2/27/2018 | 80305 | $400.00 |
| Midwest | 0468062427 | I.A. | 2/27/2018 | 80305 | $85.93 |
| Star Pain | 0468062427 | I.A. | 2/27/2018 | 80305 | $400.00 |
| Midwest | 0470796094 | M.S. | 2/2/2018 | 80305 | $85.93 |
| Star Pain | 0470796094 | M.S. | 2/2/2018 | 80305 | $400.00 |
| Midwest | 0470796094 | M.S. | 2/28/2018 | 80305 | $85.93 |
| Star Pain | 0470796094 | M.S. | 2/28/2018 | 80305 | $400.00 |
| Midwest | 0478816564 | M.G. | 1/12/2018 | 80305 | $85.93 |
| Star Pain | 0478816564 | M.G. | 1/12/2018 | 80305 | $400.00 |
| Midwest | 0484244215 | J.Y. | 2/8/2018 | 80305 | $85.93 |
| Star Pain | 0484244215 | J.Y. | 2/8/2018 | 80305 | $400.00 |
| Midwest | 0484244215 | J.Y. | 3/8/2018 | 80305 | $85.93 |
| Star Pain | 0484244215 | J.Y. | 3/8/2018 | 80305 | $400.00 |
| Midwest | 0484244215 | J.Y. | 4/6/2018 | 80305 | $85.93 |
| Star Pain | 0484244215 | J.Y. | 4/6/2018 | 80305 | $400.00 |
| Midwest | 0484244215 | N.D. | 2/13/2018 | 80305 | $85.93 |
| Star Pain | 0484244215 | N.D. | 2/13/2018 | 80305 | $400.00 |
| Midwest | 0484244215 | N.D. | 3/13/2018 | 80305 | $85.93 |
| Star Pain | 0484244215 | N.D. | 3/13/2018 | 80305 | $400.00 |
| Midwest | 0484888235 | M.D. | 1/15/2018 | 80305 | $85.93 |
| Star Pain | 0484888235 | M.D. | 1/15/2018 | 80305 | $400.00 |
| Midwest | 0484888235 | N.B. | 1/15/2018 | 80305 | $85.93 |
| Star Pain | 0484888235 | N.B. | 1/15/2018 | 80305 | $400.00 |
| Midwest | 0486282031 | R.E. | 2/2/2018 | 80305 | $85.93 |
| Star Pain | 0486282031 | R.E. | 2/2/2018 | 80305 | $400.00 |
| Midwest | 0486282031 | R.E. | 3/1/2018 | 80305 | $85.93 |
| Star Pain | 0486282031 | R.E. | 3/1/2018 | 80305 | $400.00 |
| Midwest | 0486659261 | J.G. | 3/1/2018 | 80305 | $85.93 |
| Star Pain | 0486659261 | J.G. | 3/1/2018 | 80305 | $400.00 |
| Midwest | 0486659261 | J.G. | 4/5/2018 | 80305 | $85.93 |
| Star Pain | 0486659261 | J.G. | 4/5/2018 | 80305 | $400.00 |
| Midwest | 0486896276 | D.A. | 3/6/2018 | 80305 | $85.93 |
| Star Pain | 0486896276 | D.A. | 3/6/2018 | 80305 | $400.00 |
| Midwest | 0486896276 | D.A. | 4/5/2018 | 80305 | $85.93 |
| Star Pain | 0486896276 | D.A. | 4/5/2018 | 80305 | $400.00 |
| Midwest | 0486896276 | M.A. | 2/6/2018 | 80305 | $85.93 |
| Star Pain | 0486896276 | M.A. | 2/6/2018 | 80305 | $400.00 |
| Midwest | 0487935702 | M.D. | 1/24/2018 | 80305 | $85.93 |

| Defendant | Claim No. | Patient Initials | Date of Service | CPT Code | Billed Amount |
|-----------|-----------|------------------|-----------------|----------|---------------|
| Star Pain | 0487935702 | M.D. | 1/24/2018 | 80305 | $400.00 |
| Midwest | 0487935702 | M.D. | 3/9/2018 | 80305 | $85.93 |
| Star Pain | 0487935702 | M.D. | 3/9/2018 | 80305 | $400.00 |
| Midwest | 0488471541 | D.K. | 2/12/2018 | 80305 | $85.93 |
| Star Pain | 0488471541 | D.K. | 2/12/2018 | 80305 | $400.00 |
| Midwest | 0489281279 | B.Z. | 1/22/2018 | 80305 | $85.93 |
| Star Pain | 0489281279 | B.Z. | 1/22/2018 | 80305 | $400.00 |
| Midwest | 0489281279 | B.Z. | 2/16/2018 | 80305 | $85.93 |
| Star Pain | 0489281279 | B.Z. | 2/16/2018 | 80305 | $400.00 |
| Midwest | 0489281279 | B.Z. | 3/16/2018 | 80305 | $85.93 |
| Star Pain | 0489281279 | B.Z. | 3/16/2018 | 80305 | $400.00 |
| Midwest | 0489281279 | J.E. | 1/22/2018 | 80305 | $85.93 |
| Star Pain | 0489281279 | J.E. | 1/22/2018 | 80305 | $400.00 |
| Midwest | 0489281279 | J.E. | 3/16/2018 | 80305 | $85.93 |
| Star Pain | 0489281279 | J.E. | 3/16/2018 | 80305 | $400.00 |
| Midwest | 0493467542 | A.G. | 3/13/2018 | 80305 | $85.93 |
| Star Pain | 0493467542 | A.G. | 3/13/2018 | 80305 | $400.00 |
| Midwest | 0494724552 | H.E. | 3/13/2018 | 80305 | $85.93 |
| Star Pain | 0494724552 | H.E. | 3/13/2018 | 80305 | $400.00 |
| Midwest | 0494724552 | H.F. | 3/14/2018 | 80305 | $85.93 |
| Star Pain | 0494724552 | H.F. | 3/14/2018 | 80305 | $400.00 |
| Midwest | 0494724552 | H.F. | 4/13/2018 | 80305 | $85.93 |
| Star Pain | 0494724552 | H.F. | 4/13/2018 | 80305 | $400.00 |
| Midwest | 0498721869 | E.A. | 4/17/2018 | 80305 | $85.93 |
| Star Pain | 0498721869 | E.A. | 4/17/2018 | 80305 | $400.00 |
| Midwest | 0498721869 | F.E. | 4/17/2018 | 80305 | $85.93 |
| Star Pain | 0498721869 | F.E. | 4/17/2018 | 80305 | $400.00 |
| Midwest | 0537276925 | A.J. | 3/8/2019 | 80305 | $250.00 |
| Star Pain | 0537276925 | A.J. | 3/8/2019 | 80305 | $400.00 |
| Midwest | TXA-0183685 | N.M. | 1/16/2018 | 80305 | $85.93 |
| Star Pain | TXA-0183685 | N.M. | 1/16/2018 | 80305 | $400.00 |
| Midwest | TXA-0191932 | K.P. | 2/5/2018 | 80305 | $85.93 |
| Star Pain | TXA-0191932 | K.P. | 2/5/2018 | 80305 | $400.00 |
| Midwest | TXA-0183685 | N.M. | 4/18/2018 | 80305 | $85.93 |
| Star Pain | TXA-0183685 | N.M. | 4/18/2018 | 80305 | $400.00 |

321.   Allstate is not obligated to pay for duplicative services and is entitled to reimbursement for those duplicative bills for which it was induced to tender payment.

## B.   UPCODED OFFICE VISITS

322.   Certain treatment and procedures are billed using CPT Codes that reflect the level of complexity involved.

323.   It is the responsibility of the medical provider to select the CPT Code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

324.   As discussed above, the defendants made misrepresentations to Allstate by submitting documents that included CPT Codes for medical services that (1) were not actually performed, (2) were unlicensed and unlawful, (3) were not performed consistent with the AMA's requirements, and/or (4) were wholly unwarranted and unnecessary.

325.   Moreover, the billing codes submitted to Allstate by, and on behalf of, CHICM and Allan Schwartz Medical Center consistently exaggerated the level of services purportedly provided in order to inflate the charges submitted to Allstate.

326.   Most prominently, CHICM, Allan Schwartz Medical Center, and Schwartz submitted bills to Allstate seeking payment for high-level office visits and office consultations that did not occur as billed.

327.   There are five (5) levels at which an office visit/examination or office consultation can be billed using CPT Codes: levels one (1) through five (5), with level one (1) being the least involved examination and level five (5) being the most complex.

328.   Initial office visits/examinations are billed using a CPT Code that starts with the numbers "9920."

329.   The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the examination.

330.   The criteria developed by the AMA to properly assign the CPT Code for an initial visit/examination include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|---|---|---|---|---|
| 99201 | Problem focused | Problem focused | Straight forward | 10 minutes |
| 99202 | Expanded problem focused | Expanded problem focused | Straight forward | 20 minutes |
| 99203 | Detailed | Detailed | Low complexity | 30 minutes |
| 99204 | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |
| 99205 | Comprehensive | Comprehensive | High complexity | 60 minutes |

331.   Reevaluation or follow-up visits/examinations are billed using a CPT Code that starts with the numbers "9921."

332.   The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the re-examination.

333.   The criteria developed by the AMA to properly assign the CPT Code for a reevaluation or follow-up visit/examination include the components illustrated in the chart below:

|  | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE-TO-FACE TIME |
|---|---|---|---|---|
| 99211 | Minimal presenting problem(s) | Minimal presenting problem(s) | Minimal presenting problem(s) | 5 minutes |
| 99212 | Problem focused | Problem focused | Straight forward | 10 minutes |
| 99213 | Expanded problem focused | Expanded problem focused | Low complexity | 15 minutes |
| 99214 | Detailed | Detailed | Moderate complexity | 25 minutes |
| 99215 | Comprehensive | Comprehensive | High complexity | 40 minutes |

334.   Initial office consultations are billed using a CPT Code that starts with the numbers "9924."

335.   The final number that completes the five-digit CPT Code is one of the numerals between one (1) and five (5), depending on the extent of the examination.

336.   The factors considered to determine the "complexity" of medical decision making in arriving at a proper CPT Code assignment for initial visits/examinations include:

|  | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY |
|---|---|---|---|
| Straight forward decision making (CPT Code 99201-99202) | Minimal | Minimal or none | Minimal |
| Low complexity decision making (CPT Code 99203) | Limited | Limited | Low |

| | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY |
|---|---|---|---|
| **Moderate complexity medical decision making (CPT Code 99204)** | Multiple | Moderate | Moderate |
| **High complexity medical decision making (CPT Code 99205)** | Extensive | Extensive | High |

337. The AMA has published examples of office visits that are appropriately billed using CPT Code 99205, including:

- "Initial outpatient evaluation of a 69-year-old male with severe chronic obstructive pulmonary disease, congestive heart failure, and hypertension."

- "Initial office evaluation of a 65-year-old female with exertional chest pain, intermittent claudication, syncope and a murmur of aortic stenosis."

*CPT Assistant, Spring 1992.*

338. The AMA has published examples of office visits that are appropriately billed using CPT Code 99204, including:

- "Office visit for initial evaluation of a 63-year-old male with chest pain on exertion."

- "Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion.

- "Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization three times."

*CPT Assistant, Spring 1992.*

339.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99215, including:

- "Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly."

- "Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient."

*CPT Assistant, Spring 1992.*

340.   The AMA has published examples of office visits that are appropriately billed using CPT Code 99214, including:

- "Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet.  She now complains of frequency to urination and weight loss, blood sugar of 320 and negative ketones on dipstick."

- "Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication."

*CPT Assistant, Spring 1992.*

341.   The patients at issue in this Complaint almost never presented with symptoms or diagnoses similar in severity or complexity to any of the examples set out above.

342.   Instead, at most, the defendants' patients were involved in low-level motor vehicle accidents and presented with soft-tissue injuries and complaints.

343.   Yet, CHICM and Allan Schwartz Medical Center almost always billed Allstate for level four (4) and five (5) examinations for patient evaluations (i.e., CPT Codes 99204, 99205, 99214, and 99215).

344.   CHICM billed for a level four (4) and five (5) evaluation or consultation more than 91% of the time with respect to patients at issue in this Complaint.  *See* Exhibit 3.

345.   CHICM's billing for level four (4) or five (5) office visits constitutes a fraudulent misrepresentation of the services actually rendered, as the defendants rarely performed anything more than a perfunctory examination that often did not consist of anything more than asking patients a few questions.

346.   Allan Schwartz Medical Center billed for a level four (4) evaluation or consultation 100% of the time with respect to patients at issue in this Complaint.  *See* Exhibit 7.

347.   Allan Schwartz Medical Center's billing for level four (4) office visits constitutes a fraudulent misrepresentation of the services actually rendered, as the defendants rarely performed anything more than a perfunctory examination that often did not consist of anything more than asking patients a few questions.

348.   By creating medical bills that included CPT Codes for office visits and then causing such bills to be mailed to Allstate, CHICM and Allan Schwartz Medical

Center represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

349.   However, all of the bills prepared and submitted by CHICM and Allan Schwartz Medical Center were submitted using fraudulent and deceptive examination CPT Codes.

350.   As such, Allstate is not obligated to pay any pending bills for office visits and is entitled to reimbursement for those office visits for which it has already tendered payment.

### C.   FRAUDULENT CHARGES USING CPT CODE 99080

351.   Star Pain and Comprehensive Pain submitted fraudulent charges for CPT Code 99080 (*"Special reports such as insurance forms, more than the information conveyed in the usual medical communications or standard reporting form"*) to Allstate seeking payment for issuing disability certificates to patients at issue herein.

352.   The disability certificates issued by Star Pain and Comprehensive Pain are standard reporting forms that do not rise to the level of special reports and are therefore not properly billed using CPT Code 99080.

353.   Yet, Star Pain and Comprehensive Pain billed Allstate using CPT Code 99080 on the same date of service Allstate was billed for office visits for almost every office visit of every patient.  *See* Exhibits 1 and 2.

354.   This fraud is magnified by the fact that, as discussed above, (1) the defendants used the lure of disability certifications to induce patients to return so the defendants could bill Allstate and not because these disability certificates were medically necessary and (2) the defendants almost never submitted the actual disability certifications to Allstate or even notated the medical record indicating that a disability certificate was issued or why.

355.   Star Pain and Comprehensive Pain submitted fraudulent charges for CPT Code 99080 for the sole purpose of inflating the amount they charges for each patient's office visit.

356.   Allstate is not obligated to pay Star Pain and Comprehensive Pain for their fraudulent billing of CPT Code 99080 and is entitled to a return of any monies paid.

## D.   UNBUNDLING

357.   The National Correct Coding Initiative ("NCCI") was established to promote national correct coding methodologies and to control improper coding leading to inappropriate payment.

358.   The NCCI contains an edit table entitled the "Column One/Column Two Correct Coding Edit Table" that identifies billing codes that should not be reported together because the services (and reimbursement) of the Column Two code is subsumed by the services (and reimbursement) for the Column One code.

359.   Violation of the edits (billing a Column One code and a Column Two code on the same day for the same patient) is known as "unbundling," which occurs when a provider bills separately for individual components of a procedure that are included in another billing code also billed for the same date of service.

360.   Star Pain and Midwest routinely submitted bills to Allstate seeking payment for unbundled services.

361.   For each violation of the Column One and Column Two Edit Table, it is the procedure in Column Two that is unbundled from Column One and therefore is not compensable.

### 1.   Unbundled Intravenous Infusion Charges

362.   Star Pain submitted bills to Allstate that contained charges for CPT Code 96365 (*"Intravenous infusion, for therapy, prophylaxis, or diagnosis (specify substance or drug); initial, up to 1 hour"*) and CPT Code 99152 (*"Moderate sedation services provided by the same physician or other qualified health care professional performing the diagnostic or therapeutic service that the sedation supports, requiring the presence of an independent trained observer to assist in the monitoring of the patient's level of consciousness and physiological status; initial 15 minutes of intra-service time, patient age 5 years or older"*) for the same patient during the same date of service.  *See* Exhibit 1.

363.   CPT Code 96365 is a Column Two code and CPT Code 99152 is a Column One code when billed on the same date of service for the same patient.

364.   Thus, each charge for CPT Code 96365 is unbundled from CPT Code 99152 and is therefore not compensable.

## 2.   Unbundled Presumptive Urine Drug Screen Charges

365.   Star Pain and Midwest submitted bills to Allstate for CPT Code 80305 and CPT Code 80306 for the same patient on the same date of service.  *See* Exhibits 1 and 6.

366.   CPT Code 80305 is a Column Two code and CPT Code 80306 is a Column One code when billed on the same date of service for the same patient.

367.   The billing tactics used by Star Pain and Midwest demonstrate the steps taken to conceal the unbundled charges.

368.   Star Pain and Midwest often submitted bills to Allstate that contained a charge for CPT Code 80305 in addition to an office visit charge.

369.   Then, several days, sometimes weeks, later, Star Pain and Midwest submitted bills to Allstate containing only CPT Code 80306 for that same date of service.

370.   For example, Star Pain billed Allstate using CPT Code 80305 and 80306 for urine drug tests allegedly performed on May 19, 2017, August 4, 2017, and September 5, 2017 relating to patient E.D. (Claim No. 0456615269).

371.   Star Pain submitted its charge for CPT Code 80305 relating to the May 19, 2017 date of service to Allstate on September 6, 2017 yet waited six (6) months to submit its charge for CPT Code 80306 for the same date of service.

372.   Star Pain submitted its charge for CPT Code 80305 relating to the August 4, 2017 date of service to Allstate on September 6, 2017 yet waited six (6) months to submit its charge for CPT Code 80306 for the same date of service.

373.   Star Pain submitted its charge for CPT Code 80305 relating to the September 5, 2017 date of service to Allstate on March 2, 2018 yet waited three (3) weeks to submit its charge for CPT Code 80306 for the same date of service.

### 3.   Unbundled Definitive Urine Drug Testing Charges

374.   Midwest submitted bills to Allstate for urine drug testing for both CPT Code 80363 (*"opioids and opiate analogs; 3 or 4"*) and CPT Code 80364 (*"opioids and opiate analogs; 5 or more"*) on the same dates of service for the same patient. *See* Exhibit 6.

375.   However, if Midwest performed five (5) or more tests regarding opioids and opiate analogs, then only one code should be billed to Allstate for those tests.

376.   Thus, each charge for CPT Code 80363 is unbundled from CPT Code 80364 and is therefore not compensable.

### E.   FRAUDULENTLY BILLED ANESTHESIA

377.   Star Pain submitted bills to Allstate seeking payment for two (2) units of CPT Code 99152 (*"Moderate sedation services provided by the same physician or other qualified health care professional performing the diagnostic or therapeutic service that the sedation supports, requiring the presence of an independent trained observer to assist in the monitoring of the patient's level of consciousness and physiological status; initial 15 minutes of intra-service time, patient age 5 years or older"*) on the same date of service relating to several patients at issue in this Complaint.  *See* Exhibit 1.

378.   However, CPT Code 99152 is properly billed for the initial fifteen (15) minutes of moderate sedation that was administered to a patient over five (5) years old.

379.   If moderate sedation is administered to a patient for an additional fifteen (15) minutes, CPT Code 99153 is the proper CPT Code to bill.

380.   Star Pain improperly billed Allstate two (2) units of CPT Code 99152 instead of one (1) unit of CPT Code 99152 and one (1) unit of CPT Code 99153 (if applicable) for several patients at issue herein because each unit of 99152 pays more than 99153.

381.   Furthermore, the medical records submitted to Allstate by Star Pain corresponding to each charge for CPT Code 99152 fail to identify how long the billed for moderate sedation was administered to the patient, if at all.

382.   In other words, not only did Star Pain improperly bill Allstate a second unit of CPT Code 99152, Star Pain's medical records each failed to substantiate that even one unit of CPT Code 99152 was warranted.

## F.   BILLING USING DELETED CPT CODES

383.   The AMA made several changes in the Pathology and Laboratory 80000 series code section of the CPT Code effective January 1, 2017, including but not limited to the deletion of 81 CPT Codes.

384.   Relevant to this Complaint, the AMA deleted CPT Code 80304 ("*drug screen, any number of drug classes, presumptive, single or multiple drug class method; not otherwise specified presumptive procedure (eg, TOF, MALDI, LDTD, DESI, DART), each procedure*") as of January 1, 2017.

385.   Notwithstanding the deletion of this CPT Code, Midwest fraudulently billed Allstate using deleted CPT Code 80304 at least thirty-four (34) times after January 1, 2017.  *See* Exhibit 6.

386.   Allstate is not required to pay Midwest for charges using deleted CPT Codes.

## XI. DEFENDANTS' UNREASONABLE AND UNCUSTOMARY CHARGES

### A. MICHIGAN LAW REGARDING REASONABLE AND CUSTOMARY CHARGES

387.  The amounts the defendants charged to Allstate were far above reasonable and customary prices for the treatment and services allegedly rendered.

388.  Michigan courts have stated explicitly that "medical care providers are prohibited by law from charging more than a reasonable fee." McGill v. Auto. Ass'n, 207 Mich. App. 402, 405 (1994).

389.  The Michigan No-Fault Act is clear that only "reasonable charges" constitute allowable expenses thereunder.  Mich. Comp. Laws § 500.3107(1)(a).

390.  Michigan law is also clear that the burden of proving the reasonableness of charges submitted for No-Fault benefits lies with the provider.

391.  For the reasons discussed *infra*, the defendants cannot meet their burden, thereby dismissing Allstate's obligation to pay any of the unreasonable charges for urine drug testing and DME, and entitling Allstate to reimbursement for those amounts already paid.

### B. EXCESSIVE AND UNREASONABLE URINE DRUG TESTING CHARGES

392.  Star Pain and Midwest charged Allstate for urine drug screens using CPT Codes 80305 and 80306.

393.   CPT Code 80305 is a presumptive drug test for any number of drug classes and any number of devices or procedures, which is performed using a dipstick and is interpreted using direct optical observation.

394.   CPT Code 80306 is a presumptive drug test that is performed using a dipstick and is interpreted with instrumented assistance.

395.   Regardless of the method of interpretation, the presumptive urine drug tests billed by Star Pain and Midwest Medical cost less than $10.00 to perform.

396.   When asked about a reasonable charge for presumptive urine drug testing, Sharma testified "[b]ecause it's only a $2.00 cup, and like $20.00, maybe $15.00 could be a reasonable charge."

397.   Khoury testified that he pays $5.00 for the cups used to perform urine drug testing in his office and he further testified that auto insurers are billed at a higher rate "because it's a golden goose. They get more."

398.   Notwithstanding that both Sharma and Khoury testified that the cost to perform presumptive urine drug testing is less than $10.00, Star Pain regularly billed Allstate $1,404.00 using CPT Code 80306 and as much as $1,404.00 but no less than $400.00 when it billed CPT Code 80305.  *See* Exhibit 1.

## C.   EXCESSIVE AND UNREASONABLE EVALUATION CHARGES

399.   CHICM and Allan Schwartz Medical Center charged Allstate at excessive rates for patient evaluations.

400. CHICM billed Allstate as much as $1,711.30 but no less than $650.00 for level four (4) and as much as $2,153.12 but no less than $750.00 for level five (5) initial patient evaluations (i.e., CPT Codes 99204 and 99205). *See* Exhibit 3.

401. CHICM billed Allstate as much as $1,120.79 but no less than $400.00 for level four (4) and as much as $1,506.16 but no less than $700.00 for level five (5) follow-up patient evaluations (i.e., CPT Codes 99214 and 99215). Id.

402. Allan Schwartz Medical Center billed Allstate $900.00 for level four (4) initial patient evaluations (i.e., CPT Code 99204). *See* Exhibit 7.

403. Allan Schwartz Medical Center billed Allstate $600.00 for level four follow-up patient evaluations (i.e., CPT Code 99214). Id.

404. CHICM's and Allan Schwartz Medical Center's charges are grossly excessive when compared to other prominent Michigan payors.

405. For example, Medicare paid for patient evaluations performed in Detroit at the following amounts for patient evaluations performed in 2019 and 2020:

|                  | 2019     | 2020     |
| ---------------- | -------- | -------- |
| **CPT Code 99204** | $136.02 | $171.81 |
| **CPT Code 99205** | $177.39 | $217.16 |
| **CPT Code 99214** | $82.25  | $112.68 |
| **CPT Code 99215** | $150.77 | $151.42 |

406. Michigan Medicaid paid for evaluations in 2019 and 2020:

|                  | 2019     | 2020     |
| ---------------- | -------- | -------- |
| **CPT Code 99204** | $72.11  | $72.50  |
| **CPT Code 99205** | $94.10  | $94.69  |
| **CPT Code 99214** | $43.98  | $44.18  |
| **CPT Code 99215** | $62.01  | $62.40  |

407.   The Michigan worker's compensation program paid patient evaluations in 2019 and 2020:

|  | 2019 | 2020 |
|---|---|---|
| CPT Code 99204 | $167.26 | $167.49 |
| CPT Code 99205 | $210.51 | $211.79 |
| CPT Code 99214 | $109.75 | $110.00 |
| CPT Code 99215 | $147.45 | $147.91 |

408.   These payment amounts are indicative of the range of what constitutes a reasonable charge.

409.   CHICM and Allan Schwartz Medical Center submitted charges to Allstate that far exceed this range of reasonable charges.

410.   CHICM used multiple rates when billing Allstate for the same service, providing no rationale for the inconsistency.

411.   At its higher rate, CHICM charged Allstate more than ten (10) times the amount allowed by Medicare, more than nineteen (19) times the amount permitted by Michigan Medicaid, and nearly seven (7) times more than the amount that Michigan worker's compensation pays.

412.   At its lower rate, CHICM charged Allstate more than four (4) times the amount allowed by Medicare, more than seven (7) times the amount permitted by Michigan Medicaid, and nearly three (3) times more than the amount that Michigan worker's compensation pays.

413.   Allan Schwartz Medical Center charged Allstate more than five (5) times the amount allowed by Medicare and more than twelve (12) times the amount permitted by Michigan Medicaid.

414.   The excessive nature of the patient evaluation charges submitted by CHICM far exceed what constitutes a reasonable charge.

### D.   UNREASONABLE DME CHARGES

415.   In addition to being unlicensed, Star Pain and Comprehensive Pain charged excessive rates for issuing DME to patients at issue in this Complaint.

416.   Sharma, who prescribed much of the DME billed by Star Pain, testified that his personal practice would charge about five (5) times the cost of DME.

417.   When choosing a back brace, he did not look for a particular brace, "the basic … like, 20, 25 dollar braces is good enough" to Sharma.

418.   Based on Sharma's logic, a back brace should be billed for approximately $100.00 to $125.00.

419.   Star Pain and Comprehensive Pain, however, routinely charged $1,800.00 for a back brace using Healthcare Common Procedure Coding System ("HCPCS") Code L0631.  *See* Exhibits 1 and 2.

## XII.  MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.  MISREPRESENTATIONS MADE BY THE DEFENDANTS

420.   To induce Allstate to pay their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred for and provided were necessary within the meaning of the Michigan No-Fault Act, and that all treatment was lawfully and actually rendered.

421.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

422.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157(1).

423.   Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

424.   There are no less than twelve (12) separate reasons why the defendants'
alleged treatment was not in fact performed, was not lawful, was not medically
necessary, and was fraudulently billed to Allstate:

    a.   The defendants billed Allstate for treatment and services that were not actually provided.  Star Pain, Beydoun, Baydoun, and Afan submitted bills for nerve conduction studies and urine drug tests that were never performed.

    b.   Star Pain, Comprehensive Pain, Beydoun, Baydoun, Afan, and Beydoun made cash payments and other forms of inducements to lure patients to the Defendant Entities for patients who would not have presented but for the illegal inducements.

    c.   Star Pain, Beydoun, Baydoun, and Afan falsified and forged medical records.

    d.   The defendants billed Allstate for unlawfully performed treatment. Crown Procedure and Four Star Center lacked the proper certifications to provide services as a surgical center in Michigan.  Star Pain, Comprehensive Pain, and Allan Schwartz Medical Center lacked the required licensure to issue DME in Michigan.  Midwest lacked the required certification to perform urine drug testing.

    e.   Midwest billed for unnecessary and excessive urine drug testing in furtherance of the scheme to bill Allstate for as many ancillary services as possible, and not based on the individual needs of patients.

    f.   Star Pain, Beydoun, Baydoun, Afan, Khoury, and Sharma referred patients for MRIs, and Galaxie billed for MRIs, that were medically unnecessary and performed only in furtherance of the scheme to bill Allstate for as many ancillary services as possible, and not based on the individual needs of patients.

    g.   Galaxie and Beydoun submitted bills to Allstate for MRIs that were medically unnecessary and failed to adhere to applicable standards of care, including ACR guidelines.  Galaxie routinely billed for MRIs that

lacked any supporting examination or neurologic test findings.  It was the defendants' responsibility to confirm the need for MRIs pursuant to the ACR guidelines before billing for the same.

h. Star Pain, Comprehensive Pain, Allan Schwartz Medical Center, Beydoun, Baydoun, Afan, Khoury, Sharma, and Schwartz provided disability certificates that were entirely unnecessary and not provided based on the clinical needs of the patient.

i. Star Pain, Beydoun, Baydoun, Afan, Khoury, Sharma, and Midwest fraudulently submitted claims for payment to Allstate for alleged services that were also billed by different medical providers for the exact same purported treatment.

j. CHICM, Allan Schwartz Medical Center, and Schwartz fraudulently upcoded office visits, as almost every single office visit billed to Allstate was for level four (4) or level five (5) even though the office visits did not meet the criteria set by the AMA to bill at such high levels. Upcoding constitutes a fraudulent billing practice.

k. Star Pain, Beydoun, Baydoun, Afan, and Midwest submitted claims using multiple CPT Codes to describe the same procedure allegedly performed, which is a fraudulent billing practice known as unbundling.

l. The defendants charged Allstate grossly unreasonable and uncustomary amounts for all of the treatment and services billed in violation of Michigan law.

425. As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and rendered treatment without basis or adequate substantiation.

426. If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

427.   The foregoing facts—billing for services not rendered, falsifying and forging records, billing for unlicensed services, providing excessive treatment, and misrepresenting the necessity of procedures—were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

428.   Allstate had and has no contractual relationship with any of the defendants at all, including with respect to the claims at issue herein, and had no access to information or documents exposing the defendants' fraudulent conduct until it conducted the investigation that led to the filing of this action.

429.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment allegedly provided by the defendants unnecessary and unlawful.

430.   The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed hereto at Exhibits 1 through 8.

431.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary (if performed at all), as it must be in order to be compensable under Michigan law.

432.   Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

433.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, urine drug testing, injections, MRIs, procedures, facility fees, and ancillary services for which they billed Allstate.

434.   As the defendants did not render lawful and reasonably necessary medical treatment, and misrepresented the services purportedly performed, each bill and accompanying documentation submitted by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

## B.   ALLSTATE'S JUSTIFIABLE RELIANCE

435.   The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

436.   At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of medical services allegedly provided and referred by them to prevent Allstate from discovering that the claims

submitted by and on behalf of the defendants were not compensable under the Michigan No-Fault Act.

437. These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment and transportation services in order to seek payment under Michigan's No-Fault Act.

438. Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

439. Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

440. In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

441. Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services provided.

442.   As a result, Allstate has paid in excess of $366,682 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XIII.  <u>MAIL FRAUD RACKETEERING ACTIVITY</u>

443.   As discussed above, the referrals, treatment, and services purportedly provided by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

444.  The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 8, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

445.  This objective necessarily required the submission of claims for payment to Allstate.

446.  The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service.

447.  All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

448.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim, insurance payments, and the return of the cancelled checks.

449.   It was foreseeable to the defendants that mailing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including payment of fraudulent bills via checks mailed by Allstate.

450.   Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

451.   The fraudulent medical billing scheme detailed herein generated thousands of mailings.

452.   A chart highlighting representative examples of mail fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 10.

453.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via the U.S. Mail related to each exemplar patient discussed in this Complaint.

454.   It was within the ordinary course of business for Star Pain, Comprehensive Pain, Crown Procedure, CHICM, Galaxie, Midwest, Allan Schwartz

Medical Center, and Four Star Center to submit claims for No-Fault payments to insurance carriers like Allstate through the U.S. Mail.

455.   Moreover, the business of providing medical services by each of the Defendant Entities at issue herein is regularly conducted by fraudulently seeking payment to which each Defendant Entity is not entitled through the use of fraudulent communications sent via the U.S. Mail.

456.   In other words, discrete (claim- and patient-specific) instances of mail fraud are a regular way of doing business for each of the Defendant Entities.

457.   The Defendant Entities, at the direction and with the knowledge of their owners and managers (the individual defendants), continue to submit claims for payment to Allstate and, in some instances, continue to litigate against Allstate seeking to collect on unpaid claims.

458.   Thus, the defendants' commission of mail fraud continues.

459.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mail in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

460.   Allstate reasonably relied on the submissions it received from Star Pain, Comprehensive Pain, CHICM, Crown Procedure, Galaxie, Midwest, Allan Schwartz

Medical Center, and Four Star Center, including the representative submissions set out in Exhibit 10 annexed hereto and identified in the exemplar claims above.

461.   As the defendants agreed to pursue the same criminal objective (namely, mail fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIV.  DAMAGES

462.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $366,682.

463.   Exhibits 11 through 17 annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, patient claim number, check number, and amount.

464.   Exhibit 11 details payments made by Allstate to Star Pain.

465.   Exhibit 12 details payments made by Allstate to Comprehensive Pain.

466.   Exhibit 13 details payments made by Allstate to CHICM.

467.   Exhibit 14 details payments made by Allstate to Crown Procedure.

468.   Exhibit 15 details payments made by Allstate to Galaxie.

469.   Exhibit 16 details payments made by Allstate to Midwest.

470.   Exhibit 17 details payments made by Allstate to Allan Schwartz Medical Center.

471.   Allstate's claim for compensatory damages, as set out in Exhibits 11 through 17, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

472.   Every payment identified in Exhibits 11 through 17 was made by Allstate alone and Allstate has not been reimbursed for any of the payments itemized in Exhibits 11 through 17.

473.   Moreover, every payment identified in Exhibits 11 through 17 derives from a check sent by Allstate to the defendants through the U.S. Mail.

474.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

475.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

476.    Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XV.    CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Star Pain Enterprise)
### Against Crown Procedure Center LLC; Galaxie Diagnostics LLC; Midwest Medical Lab LLC; Nabil Beydoun; Fouad Baydoun; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.

477.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

478.    Star Pain constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

479.    In connection with each of the claims identified in the within Complaint, Crown Procedure, Galaxie, Midwest, Beydoun, Baydoun, Afan, Khoury, and Sharma ("Count I defendants") intentionally caused to be prepared and mailed false medical documentation by Star Pain, or knew that such false medical documentation would be mailed in the ordinary course of Star Pain's business, or should have reasonably foreseen that the mailing of such false medical documentation by Star Pain would occur, in furtherance of the Count I defendants' scheme to defraud.

480.    The Count I defendants employed, knew, or should have foreseen that,

two (2) or more mailings to demand and receive payment from Allstate on certain

dates, including, but not limited to, those dates identified in the chart annexed hereto

at Exhibit 10.

481.    Among other things, medical records, bills, and invoices were delivered

to Allstate through the U.S. Mail.

482.    Payments to Star Pain from Allstate were transmitted through the U.S.

Mail.

483.    As documented above, the Count I defendants repeatedly and

intentionally submitted, caused to be submitted, or knew that documentation would

be submitted to Allstate for medical services that were purportedly performed by

Star Pain, which they knew would be billed by Star Pain, in order to collect payment

from Allstate under applicable provisions of the Michigan No-Fault Act.

484.    Beydoun, Baydoun, and Afan owned and managed Star Pain and were

responsible for all actions taken by Star Pain and its representatives.

485.    Khoury and Sharma billed for the unlawful and medically unnecessary

treatment, when treatment was in fact rendered, by Star Pain.

486.    Crown Procedure billed Allstate for medically unnecessary facility fees

relating to procedures performed by Star Pain, if performed at all, that created the

appearance of injury and permitted Star Pain to continue billing for excessive and medically unnecessary treatment.

487.   Galaxie billed Allstate for medically unnecessary MRI scans, if performed at all, that created the appearance of injury and permitted Star Pain to continue billing for excessive and medically unnecessary treatment.

488.   Midwest billed Allstate for excessive and medically unnecessary urine drug testing, if performed at all, that created the appearance of injury and permitted Star Pain to continue billing for excessive and medically unnecessary treatment.

489.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Star Pain for the benefit of the Count I defendants that would not otherwise have been paid.

490.   The Count I defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count I defendants to continue their fraudulent scheme without detection.

491.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count I defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

492.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Star Pain for the benefit of the Count I defendants.

493.   The Count I defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

494.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I defendants' fraudulent acts.

495.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

496.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

497.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Star Pain Enterprise)
**Against Crown Procedure LLC; Galaxie Diagnostics LLC; Midwest Medical Lab LLC; Nabil Beydoun; Fouad Baydoun; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.**

498.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

499.   Defendants Crown Procedure, Galaxie, Midwest, Beydoun, Baydoun, Afan, Khoury, and Sharma ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Star Pain.

500.   The Count II defendants each agreed to further, facilitate, support, and operate the Star Pain enterprise.

501.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

502.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Star Pain even though Star Pain was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

503.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

504.    Allstate has been injured in its business and property by reason of this

conspiratorial conduct whereas Allstate has been induced to make No-Fault claim

payments as a result of the Count II defendants' unlawful conduct described herein.

505.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count II

defendants are jointly and severally liable to Allstate and Allstate is entitled to

recover from each three times the damages sustained by reason of the claims

submitted by or on behalf of the Count II defendants, and others acting in concert

with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Comprehensive Pain Enterprise)
### Against Four Star Center LLC; Muna Afan a/k/a Muna Butrus; and Riad Khoury, M.D.

506.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs

1 through 476 set forth above as if fully set forth herein.

507.    Comprehensive Pain constitutes an enterprise, as defined in 18 U.S.C.

§ 1961(4), engaged in, and the activities of which affect, interstate commerce.

508.    In connection with each of the claims identified in the within

Complaint, Four Star Center, Afan, and Khoury ("Count III defendants")

intentionally caused to be prepared and mailed false medical documentation by

Comprehensive Pain, or knew that such false medical documentation would be

mailed in the ordinary course of Comprehensive Pain's business, or should have

reasonably foreseen that the mailing of such false medical documentation by Comprehensive Pain would occur, in furtherance of the Count III defendants' scheme to defraud.

509.   The Count III defendants employed, knew, or should have foreseen that, two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 10.

510.   Among other things, medical records, bills, and invoices were delivered to Allstate through the U.S. Mail.

511.   Payments to Comprehensive Pain from Allstate were transmitted through the U.S. Mail.

512.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Comprehensive Pain, which they knew would be billed by Comprehensive Pain, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

513.   Afan and Khoury owned and managed Comprehensive Pain and were responsible for all actions taken by Comprehensive Pain and its representatives.

514.   Khoury billed for the medically unnecessary treatment, if treatment was in fact rendered, by Comprehensive Pain.

515.   Four Star Center billed Allstate for medically unnecessary facility fees relating to procedures performed by Comprehensive Pain, if performed at all, that created the appearance of injury and permitted Comprehensive Pain to continue billing for excessive and medically unnecessary treatment.

516.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Comprehensive Pain for the benefit of the Count III defendants that would not otherwise have been paid.

517.   The Count III defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count III defendants to continue their fraudulent scheme without detection.

518.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count III defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

519.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Comprehensive Pain for the benefit of the Count III defendants.

520.   The Count III defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

521.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III defendants' fraudulent acts.

522.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

523.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

524.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Comprehensive Pain Enterprise)
### Against Four Star Center LLC; Muna Afan a/k/a Muna Butrus;
### and Riad Khoury, M.D.

525.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

526.   Defendants Four Star Center, Afan, and Khoury ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Comprehensive Pain.

527.   The Count IV defendants each agreed to further, facilitate, support, and operate the Comprehensive Pain enterprise.

528.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

529.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Comprehensive Pain even though Comprehensive Pain was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

530.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

531.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count IV defendants' unlawful conduct described herein.

532.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(CHICM Enterprise)**
**Against Nabil Beydoun**

533.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

534.   CHICM constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

535.   In connection with each of the claims identified in the within Complaint, Beydoun ("Count V defendant") intentionally caused to be prepared and mailed false medical documentation by CHICM, or knew that such false medical documentation would be mailed in the ordinary course of CHICM's business, or should have reasonably foreseen that the mailing of such false medical

documentation by CHICM would occur, in furtherance of the Count V defendant's scheme to defraud.

536.   The Count V defendant employed, knew, or should have foreseen that, two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 10.

537.   Among other things, medical records, bills, and invoices were delivered to Allstate through the U.S. Mail.

538.   Payments to CHICM from Allstate were transmitted through the U.S. Mail.

539.   As documented above, the Count V defendant repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by CHICM, which they knew would be billed by CHICM, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

540.   Beydoun owned and managed CHICM and was responsible for all actions taken by CHICM and its representatives.

541.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts

to CHICM for the benefit of the Count V defendant that would not otherwise have been paid.

542.   The Count V defendant's pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count V defendant to continue their fraudulent scheme without detection.

543.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count V defendant engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

544.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to CHICM for the benefit of the Count V defendant.

545.   The Count V defendant participated in the conduct of this enterprise through a pattern of racketeering activities.

546.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V defendants' fraudulent acts.

547.   The Count V defendant's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

548.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

549.   By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(CHICM Enterprise)**
**Against Nabil Beydoun**

550.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

551.   Defendant Beydoun ("Count VI defendant") conspired to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of CHICM.

552.   The Count VI defendant agreed to further, facilitate, support, and operate the CHICM enterprise.

553.   As such, the Count VI defendant conspired to violate 18 U.S.C. § 1962(c).

554. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of CHICM even though CHICM was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

555. The Count VI defendant was aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

556. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VI defendant's unlawful conduct described herein.

557. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendant, and others acting in concert with him, together with the costs of suit, including reasonable attorney's fees.

**<u>COUNT VII</u>**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Crown Procedure Enterprise)**
**Against Star Pain Management & Rehab LLC; Nabil Beydoun; Fouad Baydoun; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.**

558. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

559. Crown Procedure constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

560. In connection with each of the claims identified in the within Complaint, Star Pain, Beydoun, Baydoun, Afan, Khoury, and Sharma ("Count VII defendants") intentionally caused to be prepared and mailed false medical documentation by Crown Procedure, or knew that such false medical documentation would be mailed in the ordinary course of Crown Procedure's business, or should have reasonably foreseen that the mailing of such false medical documentation by Crown Procedure would occur, in furtherance of the Count VII defendants' scheme to defraud.

561. The Count VII defendants employed, knew, or should have foreseen that, two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 10.

562. Among other things, medical records, bills, and invoices were delivered to Allstate through the U.S. Mail.

563. Payments to Crown Procedure from Allstate were transmitted through the U.S. Mail.

564. As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would

be submitted to Allstate for medical services that were purportedly performed by Crown Procedure, which they knew would be billed by Crown Procedure, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

565.   Beydoun, Baydoun, and Afan owned and managed Crown Procedure and were responsible for all actions taken by Crown Procedure and its representatives.

566. Star Pain, Khoury, and Sharma billed Allstate for medically unnecessary and excessive treatment and referring patients for injections and procedures, if performed at all, that permitted Crown Procedure to bill for medically unnecessary facility fees.

567. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Crown Procedure for the benefit of the Count VII defendants that would not otherwise have been paid.

568. The Count VII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count VII defendants to continue their fraudulent scheme without detection.

569.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count VII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

570.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Crown Procedure for the benefit of the Count VII defendants.

571.   The Count VII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

572.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count VII defendants' fraudulent acts.

573.   The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

574.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

575.   By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them,

and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VIII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Crown Procedure Enterprise)**
**Against Star Pain Management & Rehab LLC; Nabil Beydoun; Fouad Baydoun; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.**

576.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

577.   Defendants Star Pain, Beydoun, Baydoun, Afan, Khoury, and Sharma ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Crown Procedure.

578.   The Count VIII defendants each agreed to further, facilitate, support, and operate the Crown Procedure enterprise.

579.   As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

580.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Crown Procedure even though Crown Procedure was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

581.   The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission

to Allstate of insurance claim and medical record documents containing material misrepresentations.

582.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count VIII defendants' unlawful conduct described herein.

583.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Galaxie Enterprise)
**Against Star Pain Management & Rehab LLC; Nabil Beydoun; Fouad Baydoun; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.**

584.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

585.    Galaxie constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

586.    In connection with each of the claims identified in the within Complaint, Star Pain, Beydoun, Baydoun, Afan, Khoury, and Vinod Sharma

("Count IX defendants") intentionally caused to be prepared and mailed false medical documentation by Galaxie, or knew that such false medical documentation would be mailed in the ordinary course of Galaxie's business, or should have reasonably foreseen that the mailing of such false medical documentation by Galaxie would occur, in furtherance of the Count IX defendants' scheme to defraud.

587.   The Count IX defendants employed, knew, or should have foreseen that, two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 10.

588.   Among other things, medical records, bills, and invoices were delivered to Allstate through the U.S. Mail.

589.   Payments to Galaxie from Allstate were transmitted through the U.S. Mail.

590.   As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Galaxie, which they knew would be billed by Galaxie, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

591.   Beydoun owned and managed Galaxie and was responsible for all actions taken Galaxie and its representatives.

592.    Beydoun, Baydoun, and Afan owned and managed Star Pain and were responsible for all actions taken by Star Pain and its representatives, including Star Pain's referrals to Galaxie for MRIs.

593.    Star Pain, Khoury, and Sharma prescribed medically unnecessary and excessive MRIs that were billed to Allstate by Galaxie.

594.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Galaxie for the benefit of the Count IX defendants that would not otherwise have been paid.

595.    The Count IX defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count IX defendants to continue their fraudulent scheme without detection.

596.    By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count IX defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

597.    The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Galaxie for the benefit of the Count IX defendants.

598. The Count IX defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

599. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX defendants' fraudulent acts.

600. The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

601. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

602. By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Galaxie Enterprise)
### Against Star Pain Management & Rehab LLC; Nabil Beydoun; Fouad Baydoun; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.

603. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

604.   Defendants Star Pain, Beydoun, Baydoun, Afan, Khoury, and Sharma ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Galaxie.

605.   The Count X defendants each agreed to further, facilitate, support, and operate the Galaxie enterprise.

606.   As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

607.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Galaxie even though Galaxie was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

608.   The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

609.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count X defendants' unlawful conduct described herein.

610.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims

submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Midwest Enterprise)
### Against Star Pain Management & Rehab LLC; Nabil Beydoun; Fouad Baydoun; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.

611.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

612.   Midwest constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

613.   In connection with each of the claims identified in the within Complaint, Star Pain, Beydoun, Baydoun, Afan, Khoury, and Sharma ("Count XI defendants") intentionally caused to be prepared and mailed false medical documentation by Midwest, or knew that such false medical documentation would be mailed in the ordinary course of Midwest's business, or should have reasonably foreseen that the mailing of such false medical documentation by Midwest would occur, in furtherance of the Count XI defendants' scheme to defraud.

614.   The Count XI defendants employed, knew, or should have foreseen that, two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 10.

615.   Among other things, medical records, bills, and invoices were delivered to Allstate through the U.S. Mail.

616.   Payments to Midwest from Allstate were transmitted through the U.S. Mail.

617.   As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Midwest, which they knew would be billed by Midwest, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

618.   Baydoun owned and managed Midwest and was responsible for all actions taken Midwest and its representatives.

619.   Beydoun, Baydoun, and Afan owned and managed Star Pain and were responsible for all actions taken by Star Pain and its representatives, including Star Pain's referrals to Midwest for urine drug testing.

620.   Star Pain, Khoury, and Sharma referred to Midwest for excessive and medically unnecessary urine drug testing.

621.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Midwest for the benefit of the Count XI defendants that would not otherwise have been paid.

622.   The Count XI defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XI defendants to continue their fraudulent scheme without detection.

623.   By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XI defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

624.   The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Midwest for the benefit of the Count XI defendants.

625.   The Count XI defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

626.   Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count IX defendants' fraudulent acts.

627.   The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

628.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

629.   By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Midwest Enterprise)**
**Against Star Pain Management & Rehab LLC; Nabil Beydoun; Fouad**
**Baydoun; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.;**
**and Vinod Sharma, M.D.**

630.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

631.   Defendants Star Pain, Beydoun, Baydoun, Afan, Khoury, and Sharma ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Midwest.

632.   The Count XII defendants each agreed to further, facilitate, support, and operate the Midwest enterprise.

633.   As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

634.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Midwest even though Midwest was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

635.   The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

636.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XII defendants' unlawful conduct described herein.

637.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Allan Schwartz Medical Center Enterprise)
### Against Comprehensive Care Pain Management, P.C.; Four Star Center LLC; Muna Afan a/k/a Muna Butrus; and Allan Schwartz, D.O.

638.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

639.   Allan Schwartz Medical Center constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

640.   In connection with each of the claims identified in the within Complaint, Comprehensive Pain, Four Star Center, Afan, and Schwartz ("Count XIII defendants") intentionally caused to be prepared and mailed false medical documentation by Allan Schwartz Medical Center, or knew that such false medical documentation would be mailed in the ordinary course of Allan Schwartz Medical Center's business, or should have reasonably foreseen that the mailing of such false medical documentation by Allan Schwartz Medical Center would occur, in furtherance of the Count XIII defendants' scheme to defraud.

641.   The Count XIII defendants employed, knew, or should have foreseen that, two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 10.

642.   Among other things, medical records, bills, and invoices were delivered to Allstate through the U.S. Mail.

643.   Payments to Allan Schwartz Medical Center from Allstate were transmitted through the U.S. Mail.

644.   As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Allan Schwartz Medical Center, which they knew would be billed by Allan Schwartz Medical Center, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

645.   Afan and Schwartz owned and managed Allan Schwartz Medical Center and were responsible for all actions taken by Allan Schwartz Medical Center and its employees and representatives.

646.   Schwartz billed for the medically unnecessary treatment, if treatment was in fact rendered, by Allan Schwartz Medical Center.

647.   Comprehensive Pain and its owner Afan transferred patients to Allan Schwartz Medical Center thus enabling Allan Schwartz Medical Center to submit bills to Allstate for unlawful and medical unnecessary treatment.

648.   Four Star Center billed Allstate for medically unnecessary facility fees relating to procedures performed by Allan Schwartz Medical Center, if performed at all, that created the appearance of injury and permitted Allan Schwartz Medical Center to continue billing for excessive and medically unnecessary treatment.

649.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts

to Allan Schwartz Medical Center for the benefit of the Count XIII defendants that would not otherwise have been paid.

650. The Count XIII defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XIII defendants to continue their fraudulent scheme without detection.

651. By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XIII defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

652. The activities alleged in this Complaint had the direct effect of causing funds to be transferred from Allstate to Allan Schwartz Medical Center for the benefit of the Count XIII defendants.

653. The Count XIII defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

654. Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XIII defendants' fraudulent acts.

655. The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

656.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

657.  By virtue of the Count XIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIV
## VIOLATION OF 18 U.S.C. § 1962(d)
## (Allan Schwartz Medical Center Enterprise)
## Against Comprehensive Care Pain Management, P.C.; Four Star Center LLC; Muna Afan a/k/a Muna Butrus; and Allan Schwartz, D.O.

658.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

659.  Defendants Comprehensive Pain, Four Star Center, Afan, and Schwartz ("Count XIV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Allan Schwartz Medical Center.

660.  The Count XIV defendants each agreed to further, facilitate, support, and operate the Allan Schwartz Medical Center enterprise.

661.  As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

662. The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Allan Schwartz Medical Center even though Allan Schwartz Medical Center was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

663. The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

664. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the Count XIV defendants' unlawful conduct described herein.

665. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XV
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Four Star Center Enterprise)
### Against Comprehensive Care Pain Management, P.C.; Allan Schwartz Medical Center PC; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Allan Schwartz, D.O.

666.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

667.   Four Star Center constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

668.   In connection with each of the claims identified in the within Complaint, Comprehensive Pain, Allan Schwartz Medical Center, Afan, Khoury, and Schwartz ("Count XV defendants") intentionally caused to be prepared and mailed false medical documentation by Four Star Center, or knew that such false medical documentation would be mailed in the ordinary course of Four Star Center's business, or should have reasonably foreseen that the mailing of such false medical documentation by Four Star Center would occur, in furtherance of the Count XV defendants' scheme to defraud.

669.   The Count XV defendants employed, knew, or should have foreseen that, two (2) or more mailings to demand and receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart annexed hereto at Exhibit 10.

670.   Among other things, medical records, bills, and invoices were delivered to Allstate through the U.S. Mail.

671.   Payments to Four Star Center from Allstate were transmitted through the U.S. Mail.

672.   As documented above, the Count XV defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Four Star Center, which they knew would be billed by Four Star Center, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

673.   Afan owned and managed Four Star Center and was responsible for all actions taken by Four Star Center and its employees and representatives.

674.   Comprehensive Pain, Allan Schwartz Medical Center, Khoury, and Schwartz billed Allstate for medically unnecessary and excessive treatment and referring patients for injections and procedures, if performed at all, that permitted Four Star Center to bill for medically unnecessary facility fees.

675.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued drafts to Four Star Center for the benefit of the Count XV defendants that would not otherwise have been paid.

676.  The Count XV defendants' pattern of submitting, causing to be submitted, or knowing that fraudulent claims that appeared legitimate on their face would be submitted prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the Count XV defendants to continue their fraudulent scheme without detection.

677.  By mailing, or agreeing that the mails would be used to submit, numerous fraudulent claims in an ongoing scheme, the Count XV defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

678.  The activities alleged in this Complaint had the direct effect of causing Allstate to incur costs related to the review of claims caused to be submitted by the Count XV defendants.

679.  The Count XV defendants participated in the conduct of this enterprise through a pattern of racketeering activities.

680.  Allstate is a "person," as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count XV defendants' fraudulent acts.

681.  The Count XV defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

682.   Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

683.   By virtue of the Count XV defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XVI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Four Star Center Enterprise)**
**Against Comprehensive Care Pain Management, P.C.; Allan Schwartz**
**Medical Center PC; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.;**
**and Allan Schwartz, D.O.**

684.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

685.   Defendants Comprehensive Pain, Allan Schwartz Medical Center, Afan, Khoury, and Schwartz ("Count XVI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Four Star Center.

686.   The Count XVI defendants each agreed to further, facilitate, support, and operate the Four Star Center enterprise.

687.   As such, the Count XVI defendants conspired to violate 18 U.S.C. § 1962(c).

688.   The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Four Star Center even though Four Star Center was not eligible to collect No-Fault payments by virtue of its unlawful conduct.

689.   The Count XVI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

690.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has incurred costs to review and adjust the claims submitted as a result of the Count XVI defendants' unlawful conduct described herein.

691.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVII
## COMMON LAW FRAUD
### Against All Defendants

692.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

693.   The scheme to defraud perpetrated by Star Pain, Comprehensive Pain, CHICM, Crown Procedure, Galaxie, Midwest, Allan Schwartz Medical Center, Four Star Center, Beydoun, Baydoun, Afan, Khoury, Sharma, and Schwartz ("Count XVII defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were lawfully and actually providing necessary services in compliance with the Michigan No-Fault Act and were entitled to collect benefits thereunder.

694.   The misrepresentations of fact made by the Count XVII defendants include, but are not limited to, those material misrepresentations discussed in section XII *supra*.

695.   The Count XVII defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

696.   The misrepresentations were intentionally made by the Count XVII defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment under the Michigan No-Fault Act would be submitted to Allstate.

697.   The Count XVII defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

698.   Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to No-Fault insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

699.   As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

## COUNT XVIII
## CIVIL CONSPIRACY
## Against All Defendants

700.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

701.   Defendants Star Pain, Comprehensive Pain, CHICM, Crown Procedure, Galaxie, Midwest, Allan Schwartz Medical Center, Four Star Center, Beydoun, Baydoun, Afan, Khoury, Sharma, and Schwartz ("Count XVIII defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment under the No-Fault Act to which they were not entitled because (1) the defendants did not actually render the

treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants did not submit reasonable charges to Allstate.

702.   The Count XVIII defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

703.   This purpose was known to all of the Count XVIII defendants and intentionally pursued.

704.   Despite knowing that the defendants were not entitled to payment under the No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they charged outrageous and unreasonable prices, the Count XVIII defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment to the defendants.

705.   In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

706.   All of the Count XVIII defendants directly benefited from the payments made to Star Pain, Comprehensive Pain, CHICM, Crown Procedure, Galaxie, Midwest, Allan Schwartz Medical Center, and Four Star Center.

707.   All of the Count XVIII defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XVIII defendants in the commission of acts done for the benefit of all Count XVIII defendants and to the unjustified detriment of Allstate.

708.   Accordingly, all of the Count XVIII defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

## COUNT XIX
## PAYMENT UNDER MISTAKE OF FACT
### Against Star Pain Management & Rehab LLC; Comprehensive Care Pain Management, P.C.; Central Health Institute Center of Michigan LLC; Crown Procedure Center LLC; Galaxie Diagnostics LLC; Midwest Medical Lab LLC; and Allan Schwartz Medical Center, PC

709.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

710.   Allstate paid the amounts described herein and itemized in Exhibits 11 through 17 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Star Pain, Comprehensive Pain, CHICM, Crown Procedure, Galaxie, Midwest, Allan Schwartz Medical Center, and Four Star Center ("Count XIX defendants").

711.   Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XIX defendants, which misrepresented the fact,

reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

712.   The Count XIX defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

713.   Allstate is entitled to restitution from each of the Count XIX defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

**COUNT XX**
**UNJUST ENRICHMENT**
**Against All Defendants**

714.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

715.   Allstate paid monies, including those amounts set out in Exhibits 11 through 17, in response to the claims submitted, or caused to be submitted, by defendants Star Pain, Comprehensive Pain, CHICM, Crown Procedure, Galaxie, Midwest, Allan Schwartz Medical Center, Four Star Center, Beydoun, Baydoun, Afan, Khoury, Sharma, and Schwartz ("Count XX defendants") in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

716.   Allstate's payments constitute a benefit which the Count XX defendants aggressively sought and voluntarily accepted.

717.   The Count XX defendants wrongfully obtained payments from Allstate through the fraudulent scheme detailed herein.

718.   The Count XX defendants have been unjustly enriched by receipt of these wrongfully obtained payments from Allstate.

719.   The Count XX defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

### COUNT XXI
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

720.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 476 set forth above as if fully set forth herein.

721.   Defendants Star Pain, Comprehensive Pain, CHICM, Crown Procedure, Galaxie, Midwest, Allan Schwartz Medical Center, Four Star Center, Beydoun, Baydoun, Afan, Khoury, Sharma, and Schwartz ("Count XXI defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

722.   The Count XXI defendants also rendered services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for

the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

723.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.   Mich. Comp. Laws §§ 500.3105 and 500.3107.

724.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.  Mich. Comp. Laws § 500.3107.

725.   The lack of lawfully-rendered treatment (such as lack of licensure) is also a defense to an insurer's obligation to pay No-Fault benefits.

726.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

727.   Further, providers may only charge a reasonable amount for the products, services, and accommodations rendered.   Mich. Comp. Laws § 500.3157(1).

728.   The Count XXI defendants continue to submit claims under the No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

729.   The Count XXI defendants will continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied No-Fault claims submitted by any of the Count XXI defendants for any or all of the reasons set out in the within Complaint.

730.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants billed for unnecessary and unlawful treatment that is not compensable under Michigan's No-Fault Act.

731.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

732.   As such, the Count XXI defendants have no standing to submit, pursue, or receive No-Fault benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants cannot seek payment from Allstate for

benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

733.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXI defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XVI.  **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, Esurance Insurance Company, and Esurance Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Star Pain Enterprise)**
**Against Crown Procedure LLC; Galaxie Diagnostics LLC; Midwest Medical Lab LLC; Nabil Beydoun; Fouad Baydoun Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.**

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Star Pain Enterprise)
### Against Crown Procedure LLC; Galaxie Diagnostics LLC; Midwest Medical Lab LLC; Nabil Beydoun; Fouad Baydoun Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Comprehensive Pain Enterprise)
### Against Four Star Center LLC; Muna Afan a/k/a Muna Butrus; and Riad Khoury, M.D.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Comprehensive Pain Enterprise)
### Against Four Star Center LLC; Muna Afan a/k/a Muna Butrus;
### and Riad Khoury, M.D.

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)   GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (CHICM Enterprise)
### Against Nabil Beydoun

(a)   AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
## (CHICM Enterprise)
## Against Nabil Beydoun

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
## (Crown Procedure Enterprise)
## Against Star Pain Management & Rehab LLC; Nabil Beydoun; Fouad Baydoun; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Crown Procedure Enterprise)
### Against Star Pain Management & Rehab LLC; Nabil Beydoun; Fouad Baydoun; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Galaxie Enterprise)
### Against Star Pain Management & Rehab LLC; Nabil Beydoun; Fouad Baydoun; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

### COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Galaxie Enterprise)
### Against Star Pain Management & Rehab LLC; Nabil Beydoun; Fouad Baydoun; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XI
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Midwest Enterprise)
**Against Star Pain Management & Rehab LLC; Nabil Beydoun; Fouad Baydoun; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Midwest Enterprise)
**Against Star Pain Management & Rehab LLC; Nabil Beydoun; Fouad Baydoun; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Vinod Sharma, M.D.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Allan Schwartz Medical Center Enterprise)
### Against Comprehensive Care Pain Management, P.C.; Four Star Center LLC; Muna Afan a/k/a Muna Butrus; and Allan Schwartz, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Allan Schwartz Medical Center Enterprise)
### Against Comprehensive Care Pain Management, P.C.; Four Star Center LLC; Muna Afan a/k/a Muna Butrus; and Allan Schwartz, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XV
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Four Star Center Enterprise)
**Against Comprehensive Care Pain Management, P.C.; Allan Schwartz Medical Center PC; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Allan Schwartz, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Four Star Center Enterprise)
**Against Comprehensive Care Pain Management, P.C.; Allan Schwartz Medical Center PC; Muna Afan a/k/a Muna Butrus; Riad Khoury, M.D.; and Allan Schwartz, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XVII
## COMMON LAW FRAUD
### Against All Defendants

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

## COUNT XVIII
## CIVIL CONSPIRACY
### Against All Defendants

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

## COUNT XIX
## PAYMENT UNDER MISTAKE OF FACT
**Against Star Pain Management & Rehab LLC; Comprehensive Care Pain
Management, P.C.; Central Health Institute Center of Michigan LLC;
Crown Procedure Center LLC; Galaxie Diagnostics LLC; Midwest
Medical Lab LLC; and Allan Schwartz Medical Center PC**

(a)    AWARD Allstate its actual and consequential damages in an amount

to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT XX
## UNJUST ENRICHMENT
### Against All Defendants

(a)    AWARD Allstate its actual and consequential damages in an amount

to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT XXI
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)    DECLARE that Allstate has no obligation to pay pending and

previously denied No-Fault insurance claims submitted by Star Pain Management &

Rehab LLC, Comprehensive Care Pain Management, P.C., Central Health Institute

Center of Michigan LLC, Crown Procedure Center LLC, Galaxie Diagnostics LLC,

Midwest Medical Lab LLC, Allan Schwartz Medical Center PC, Four Star Center

LLC, Nabil Beydoun, Fouad Baydoun, Muna Afan a/k/a/ Muna Butrus, Riad

Khoury, M.D., Vinod Sharma, M.D., and Allan Schwartz, D.O. for any or all of the reasons set out in the within Complaint;

(b)    DECLARE that Star Pain Management & Rehab LLC, Comprehensive Care Pain Management, P.C., Central Health Institute Center of Michigan LLC, Crown Procedure Center LLC, Galaxie Diagnostics LLC, Midwest Medical Lab LLC, Allan Schwartz Medical Center PC, Four Star Center LLC, Nabil Beydoun, Fouad Baydoun, Muna Afan a/k/a/ Muna Butrus, Riad Khoury, M.D., Vinod Sharma, M.D., and Allan Schwartz, D.O., jointly and severally, cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)    DECLARE that Star Pain Management & Rehab LLC, Comprehensive Care Pain Management, P.C., Central Health Institute Center of Michigan LLC, Crown Procedure Center LLC, Galaxie Diagnostics LLC, Midwest Medical Lab LLC, Allan Schwartz Medical Center PC, Four Star Center LLC, Nabil Beydoun, Fouad Baydoun, Muna Afan a/k/a/ Muna Butrus, Riad Khoury, M.D., Vinod Sharma, M.D., and Allan Schwartz, D.O., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for

whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)   GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVIII. <u>JURY DEMAND</u>

The plaintiffs hereby demand a trial by jury on all clams.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*

_____

Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
John D. Tertan
jtertan@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company, Allstate*
*Fire and Casualty Insurance*
*Company, Allstate Property and*
*Casualty Insurance Company,*
*Esurance Insurance Company, and*
*Esurance Property and Casualty*
*Insurance Company*

Dated:  October 28, 2020